# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-1147

_____

|  |  |  |
|---|---|---|
| Helen J.M. Bassett, | * | |
| | * | |
| Plaintiff-Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| City of Minneapolis, | * | |
| | * | |
| Defendant-Appellee. | * | |

_____

Submitted: October 21, 1999

Filed: April 12, 2000

_____

Before BEAM, LAY, and JOHN R. GIBSON, Circuit Judges.

_____

LAY, Circuit Judge.

Helen J.M. Bassett (Bassett) brought this suit against her former employer, the City of Minneapolis (City), pursuant to Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e-2, et seq., and the Minnesota Human Rights Act (MHRA), Minn. Stat. ch. 363. Bassett alleges racial discrimination in her termination and retaliation for a series of complaints she filed against the City.[1] The district court

_____

[1]Bassett stipulated to dismissal of that portion of her complaint alleging a hostile work environment as well as a cause of action under 42 U.S.C. § 1983. The district

granted the City's motion for summary judgment and Bassett now appeals. We reverse.

We hold sufficient evidence of a genuine dispute of material fact exists as to whether the City's articulated nondiscriminatory reason for termination was a pretext from which racial bias can clearly be inferred. This judgment follows from the well-recognized proposition that in summary judgment cases the nonmoving party is entitled to all favorable inferences that may be drawn from the record. Under the circumstances, we remand both the claim of retaliation and the claim of discrimination for a jury trial.

In remanding for trial, we emphasize the oft repeated phrase that summary judgment should seldom be granted in discrimination cases. See Smith v. St. Louis Univ., 109 F.3d 1261, 1264 (8th Cir. 1997) (Arnold, R., C.J., Beam & Alsop, JJ.); see also Keathley v. Ameritech Corp., 187 F.3d 915, 919 (8th Cir. 1999) (Bowman, Heaney & Longstaff, JJ.); Lynn v. Deaconess Med. Ctr.-West Campus, 160 F.3d 484, 486 (8th Cir. 1998) (Arnold, R., Beam & Arnold, M., JJ.); Helfter v. United Parcel Serv., Inc., 115 F.3d 613, 615 (8th Cir. 1997) (Loken, Arnold, M. & Gunn, JJ.); Bialas v. Greyhound Lines, Inc., 59 F.3d 759, 762 (8th Cir. 1995) (Beam, Gibson, F. & Murphy, JJ.); Oldham v. West, 47 F.3d 985, 988 (8th Cir. 1995) (Hansen, Gibson, F. & Will, JJ.); Weissman v. Congregation Shaare Emeth, 38 F.3d 1038, 1045 (8th Cir. 1994) (McMillian, Bright & Loken, JJ.); Crawford v. Runyon, 37 F.3d 1338, 1341 (8th

court ruled on Bassett's remaining claims of race discrimination and retaliation. On appeal, Bassett argues the district court failed to recognize that she also presented a gender discrimination claim. However, neither Bassett's complaint nor subsequent documents submitted to the court plead gender discrimination. See, e.g., U.S. District Court Form JS 44 (Civil Cover Sheet) (stating cause of action as "[r]ace discrimination and reprisal in violation of Title VII . . . ."); Fed. R. Civ. P. 26(f) Report at 1-2 (Jul. 30, 1997) (claiming City's actions "constitute racial discrimination and retaliation in violation of Title VII . . . .").

Cir. 1994) (Arnold, R., C.J., Wollman & Beam, JJ.); <u>Johnson v. Minnesota Historical Soc'y</u>, 931 F.2d 1239, 1244 (8th Cir. 1991) (McMillian, Fagg & Strom, JJ.); <u>Hillebrand v. M-Tron Indus., Inc.</u>, 827 F.2d 363, 364 (8th Cir. 1987) (Lay, C.J., Heaney & Larson, JJ.).

## I. BACKGROUND

The facts of this case reveal a strained employment relationship between the appellant and her supervisor that began on appellant's second day on the job and ended with her termination. The bulk of the evidence is testimony of two people – the appellant and the supervisor – along with internal investigations that were based in large part on the supervisor's characterization of disputed events. Without attempting to detail every contested incident, we explore the record in terms of whether the appellant's alleged insubordination is disputed and a jury could reasonably find the appellee's reason for termination was pretext for racial discrimination. Because appellant's retaliation and discrimination claim are factually intertwined, our discussion of the record for each claim will overlap.

In 1992, Bassett, an African-American woman, and Mary Roland (Roland), a Caucasian woman, each sought the position of supervisor of the City's newly created Juvenile Diversion Program (Program). The Program was to be staffed by a supervisor and four juvenile diversion specialists who would be located in various police precincts throughout the City to work with at-risk youth as an alternative to the court system. Bassett also applied for a specialist position. At the time, Bassett had been a City employee for over nine years, ranked second for the supervisor position, and was ranked "number one" for the specialist position. Roland was selected as Program Supervisor and, at some time prior to interviewing Bassett for the specialist position, was informed that Bassett had ranked second for Roland's position.

Roland testified that while interviewing for the specialist position, she perceived Bassett as "aggressive" and claims she received negative comments on Bassett's work performance in other City programs. Despite these facts, Roland selected Bassett – the only minority female applicant – concededly because she believed Bassett would file a charge of discrimination if she were not hired.

Bassett began working in the Program on June 15, 1992. From the Program's inception, there was tension between Roland and Bassett. Roland documented numerous instances of unpleasant and hostile interchanges at team meetings and kept extensive hand-written notes regarding Bassett.[2] Roland admits her notes were not made contemporaneously and were transcribed from her personal time management calendar (which is now unavailable). Similar personal logs were not maintained on Bassett's co-specialists until Roland's supervisor, Captain Pufahl, and the Supervisor of the Personnel Section, Pam French, advised her to maintain notes on all the specialists. This occurred approximately six months after Roland began her notes on Bassett. Despite Roland's copious notes describing Bassett's negative effect on the

---

[2]Roland's notes begin with an entry on Bassett's second day of work which reads: "Helen pointed out about 5 things today that I really needed to look into because they would really effect our program. Acts superior to the rest of us because she has been working for the city for 9 yrs." The entry at the end of Bassett's second week reads:

> Overall the week was stressful & tense. . . . [Bassett] acts as if she is the only one who know [sic] anything. She has little/no sense of humor, so she does not share in the laughing. She asks lots of questions about everything as she critiques everything usually from neg. stand that I haven't thought of everything she knows. Her lengthy wordy discussions wear us out. It is hard to keep being polite or respectful to her. I want to remind her that she is not the supervisor.

The majority of Roland's notes on Bassett's performance, demeanor, and behavior reflect a similar tone.

Program and her peers, Roland gave Bassett a favorable six-month performance evaluation on December 22, 1992.

In early 1993, Bassett contacted the City's Affirmative Action/Equal Employment Opportunity Officer, Larry Blackwell (Blackwell) following a disagreement with Roland about union employee seniority rights. Blackwell responded by letter addressed to Bassett, which was misrouted to, and wrongfully opened by, Roland on or about March 20, 1993. While the substance of the ensuing conversation is in dispute, Roland had what she described as a "[v]ery annoying conversation" with Bassett about Blackwell's letter in which she disapproved of Bassett's inquiry.[3] Approximately six weeks later, on May 11, 1993, Bassett received a written reprimand from Roland admonishing her for "misconduct," "insubordination," and "substandard performance" dating back to October 26, 1992 (thus pre-dating the December 22, 1992, favorable evaluation).[4] Bassett challenged the written reprimand as unfounded, excessively harsh, and inconsistent with the City's policy of progressive discipline which provides for the administration of oral reprimands prior to written reprimands.

[3]Roland's notes on 3/22/93 have been edited to read: "On 3/20 I got a memo from [Bassett] that she forwarded to me from Larry Blackwell. It discusses ~~her~~ the issue of seniority. My mistake the memo was to [Bassett] from Larry Blackwell. Anyway ~~I~~ we called ~~to~~ & discussed it & she went on & on . . . ." (Roland's strikeouts in original). Roland's notes on 3/23/93 indicate Roland raised her voice with Bassett and that Bassett said Roland was "abusing" her and speaking to her in an "aggressive tone." Bassett told Roland she planned to raise the matter with Roland's superior.

[4]The misconduct and insubordination portion of the reprimand cited Bassett's dissemination to her peers of information regarding union seniority rights in violation of Roland's direct order not to do so. The reprimand also cited six areas of substandard performance including: (1) accuracy of youth reports and contracts, and timeliness of entering contracts into a computer database; (2) failure to consult her supervisor prior to closing a case; (3) too few contacts with community service agencies; (4) untimely contact with youth; (5) disrespectful and condescending behavior in team meetings; and (6) inappropriate interactions with Roland.

-5-

After a series of negotiations between Roland and Bassett's union representative, the written reprimand was revised on September 20, 1993, deleting all references to misconduct and insubordination and eliminating two of the six negative performance issues. One day later, Bassett filed charges of race and sex discrimination and retaliation with the Minnesota Department of Civil Rights (MDCR). Roland learned of Bassett's charges on October 25, 1993. Two weeks later, Roland gave Bassett a negative performance evaluation.

On August 1, 1993, Bassett submitted to Captain Pufahl a four-page complaint letter alleging Roland participated in or condoned unprofessional behavior by some specialists. Bassett asserted that the behavior was, at times, racial and sexual in nature. In one instance, Roland failed to address a statement by a specialist encouraging Roland to lift her skirt in order to increase youth contacts. Bassett also described a statement by Roland about "cleaning up" after a teen-night-out program, which Roland later recognized as sexist. In another incident, a white specialist, Sheila Isaacson (Isaacson), said she presumed Lorenzo Harris, a black specialist, would prefer "watermelon" candy; Bassett's complaint to Roland about this incident went unheeded. Further, Bassett complained that Roland required her, as a measure of the discipline imposed in a previous reprimand, to use vacation time to attend a conference while Isaacson was not required to do so. In the letter, Bassett also complained about hair pulling, taunts, physical pushing and inappropriate gestures during team meetings, and voiced frustration over Roland's unwillingness to discuss these matters with other specialists despite requests to do so. The behavior complained of in the letter was the basis for Bassett's September 21, 1993, charge with MDCR.[5]

_____

[5]More specifically, Bassett's September 21 charge alleged Roland discriminated against her in the following manner: (1) meting out unequal and excessive discipline for deficiencies similar to those of her peers; (2) scrutinizing her work performance; (3) holding her to different performance standards than peers; (4) denying her specialized training in the Program's computer database, known as CAPRS, while permitting Isaacson, a specialist on probation, to attend, and thereafter disciplining Bassett for

The record reveals that Bassett's complaints are not without support. Harris, the African-American male specialist in the Program, averred that Roland had a very erratic management style, lacked an understanding of City policy, and "simply made things up as she went along." He also testified, by affidavit, that Roland went out of her way to provoke Bassett, consistently chose to "play hardball" with Bassett, and was disrespectful to Bassett or punished her for minor infractions. Harris, however, also acknowledged that Bassett could be very "intense" when discussing work issues, and could not refrain from reacting to Roland's provocation.

On January 11, 1994, Bassett filed another charge with MDCR alleging race and sex discrimination and retaliation.[6] On that same date, Roland received notice of the discrimination charge and gave Bassett two oral reprimands, each later reduced to writing. One reprimand was based on Bassett's tardiness to a team meeting and her refusal to sit in a chair Roland had "designated" for her; it also noted Bassett's disruption of a previous meeting by asking co-workers for change to buy a soft drink.

---

failure to promptly enter contracts into the database; (5) placing Isaacson in charge of the Program during Roland's absence instead of the more senior Bassett; (6) requiring her to take vacation time to attend a conference while Isaacson was granted paid leave to attend; (7) failing to discipline fellow specialists for alleged racial and sexual statements; and (8) retaliating against her by reprimanding her participation in Internal Consultants, a City-sanctioned quality program.

[6]In this charge, which was cross-filed with the Equal Employment Opportunity Commission (EEOC), Bassett alleged Roland discriminated against her by: (1) providing false information to worker's compensation personnel resulting in a denial of benefits; (2) denying her two days off work for an out-of-town family emergency; (3) rendering a negative performance appraisal on 11/9/93 and not providing her the written document until 12/15/93; (4) increasing scrutiny of her work product; and (5) denying her request to work at home for two days following her daughter's surgery, when a white male co-worker had been granted such a privilege. In a separate proceeding, Bassett challenged the denial of worker's compensation benefits and prevailed.

The second reprimand cited Bassett's late arrival to a meeting with Captain Pufahl and Roland, despite Bassett's explanation that she had been on the phone with the mother of a youth on her caseload.

On March 7, 1994, Roland gave Bassett an oral reprimand admonishing her for failing to record lunch breaks on her daily attendance logs as directed. That same date, Bassett wrote to the MDCR claiming harassment and disparate treatment by Roland alleging she was reprimanded for not taking a lunch break, parking in the wrong parking ramp, failing to place agreements in the CAPRS database, and being unorganized. A day later, Bassett wrote to the Minneapolis Labor Relations Department and asked for a cooling off period between Roland and herself during the pendency of her discrimination charges. On March 21, 1994, Bassett made a similar request to Captain Pufahl, asking him to temporarily buffer the reporting relationship between she and Roland. Captain Pufahl denied the request, and informed her that since the fall of 1993 either he or Personnel had actively advised Roland prior to her interactions with Bassett.

On May 23, 1994, Captain Pufahl requested an IAD investigation of Bassett.[7] Pufahl's complaint stated Bassett had disobeyed Roland's direct order, violated City policy on voice mail procedures, harassed and threatened Roland, and had been discourteous to a co-worker.[8] The charges were sustained, resulting in Bassett serving

---

[7]The IAD is the investigative arm of the Minneapolis Police Department that conducts independent investigations of alleged violations of Police Department or Minneapolis Civil Service Commission rules.

[8]Roland alleged that she had given Bassett a direct order not to change the voice mail access code on her telephone. A temporary employee, Tony Johnson (Johnson) handled Bassett's youth caseload during Bassett's seven-week medical absence. Upon Bassett's return, Johnson remained on the City payroll to assist Bassett in case management. Roland placed a voice mail message on Bassett's phone reflecting their joint duties, selected a voice mail access code for them to share, and instructed Johnson

-8-

a three-day suspension without pay. On June 15, 1994, Deputy Chief of Police Roger Willow informed Bassett that, beginning immediately, Captain Pufahl would attend any formal meeting between Roland and Bassett at which issues other than discipline would be discussed.

During a phone conversation with Roland on July 6, 1994, Bassett discovered Roland was recording the call, and promptly hung up. She requested Captain Pufahl to intervene to prohibit future recording and characterized Roland's behavior as harassing, retaliatory, and evidencing disparate treatment. In her deposition, Roland admitted to surreptitiously recording conversations with Bassett without her knowledge or permission for "several months, maybe a year" and recording over the tape if it did not reveal any difficulty between she and Bassett.[9] Roland also admitted she did not record phone conversations with any of Bassett's co-workers.

On September 27, 1994, Bassett received a second negative performance appraisal and on that same date filed a charge with the Minnesota Department of Human Rights (MDHR) alleging race discrimination as well as reprisal. She reasserted that Roland had retaliated against her following her charge of discrimination with MDCR.

On October 7, 1994, Bassett referred an IAD complaint against Roland and Isaacson for harassment, and on November 3, 1994, filed a charge of disability discrimination alleging she was denied payment for hours worked and unfairly

_____

to retain Bassett's pager. Thereafter, Bassett changed the voice mail access code and, according to Roland's statement to IAD, became physically obstructive and tried to take the pager from Johnson during a meeting.

[9]The evidentiary value of Roland's tapes is questionable. Indeed, Officer Mackrell of the City's Internal Affairs Division (IAD) testified that he would not rely on a tape that had been partially erased when conducting an investigation.

suspended for three days without pay. Bassett's IAD charges were deemed unfounded.

In November and December 1994, the City researched the possibility of offering Bassett a voluntary transfer to another department. In light of the potential transfer, two actions were taken: (1) Deputy Chief Jones, Captain Pufahl's supervisor, suspended investigation on a complaint against Bassett previously referred to IAD,[10] and (2) Captain Pufahl recommended that no disciplinary action be taken against Bassett for misuse of her cellular phone. Bassett, however, refused to sign transfer papers on December 9, 1994, and on December 12, 1994, Deputy Chief Jones instructed IAD to resume its investigation. Also on December 12, Roland initiated an IAD investigation for Bassett's misuse of cellular phone privileges and failure to obey an order. Less than two weeks later, on December 20, 1994, Roland administered a written reprimand for Bassett's violation of the cellular phone policy, specifically for exceeding the monthly limit of 30 minutes or 30 calls by as much as 270 minutes and for making 30 calls in one two-day period.[11] The record reveals that other specialists who had exceeded their monthly limit of calls went unreprimanded.

On January 4, 1995, MDCR recommended a finding of probable cause on Bassett's allegations of race and sex discrimination and reprisal.[12] The next day,

_____

[10]On November 1, 1994, Roland referred a complaint to IAD charging Bassett with insubordination and harassment dating back to July 6, 1994. The investigative officer was advised by Deputy Chief Jones not to proceed with the investigation due to a possible transfer of Bassett to another City department.

[11]The union challenged this reprimand.

[12]The MDCR investigated Bassett's claims of race and gender discrimination and retaliation by examining over 1,000 pages of documents and reviewing numerous taped conversations and interviews with Roland, Bassett, and Bassett's co-workers. In an eighteen page, singled spaced summary of investigation, MDCR found "probable

Roland referred a fourth complaint against Bassett to IAD for investigation. This final IAD complaint cited Bassett for allegedly claiming that she had been diagnosed by the City doctor for work-related depression when no such diagnosis had been made. Bassett filed additional charges of discrimination and retaliation with MDHR on January 13, 1995,[13] and a similar charge was filed with MDCR on February 24, 1995.[14]

On May 15, 1995, Deputy Chief Jones sustained all but one of the charges in the IAD complaints against Bassett. A disciplinary hearing was held on May 22, 1995, at which Bassett was represented by counsel and accompanied by a union representative. Following the hearing, Deputy Chief Jones recommended to the Minneapolis Civil Service Commission (Commission) that Bassett be terminated for a pattern of insubordination. Bassett challenged the decision in a three-day contested case hearing before an administrative law judge (ALJ). On April 1, 1996, the ALJ concluded the

cause" that Bassett was (1) subjected to disparate scrutiny based on her race, and (2) retaliated against because she had attempted to pursue "legitimate channels" to stop the alleged discriminatory behavior in her employment. While not determinative on the question of discrimination, the finding of probable cause demonstrates that upon distillation of all the evidence presented, reasonable minds could disagree over the material fact of retaliation and intentional discrimination. See Chandler v. Roudebush, 425 U.S. 840, 863 n. 39 (1976) (prior administrative findings made in employment discrimination claim admissible at trial under Fed. R. Evid. 803(8)(c)), cf. Johnson v. Yellow Freight Sys., Inc., 734 F.2d 1304, 1309 (8th Cir. 1984) (recognizing admissibility of EEOC reasonable cause determination, but declining to adopt per se rule of admissibility).

[13]Bassett's charge, cross-filed with the EEOC, alleged she was unfairly disciplined for misuse of a cellular telephone, and harassed by Roland and Captain Pufahl by being (1) subjected to an IAD investigation, and (2) referred for a fitness for duty evaluation following her statement that she was under work-related stress.

[14]Within ten days of probable cause findings on her discrimination claims, Bassett alleged that she was again subjected to an IAD investigation for alleged rule infractions that were routinely addressed through supervisory conferences.

City failed to establish "just cause" to support Bassett's termination and recommended her reinstatement.[15]  The Commission rejected the ALJ's recommendation on July 1, 1996, and affirmed Bassett's termination.  Thereafter, Bassett filed another charge of race discrimination and reprisal with the MDCR which was cross-filed with the EEOC. The EEOC issued a Notice of Right to Sue and Bassett timely filed this action.

## II. DISCUSSION

A. Retaliation

Title VII makes it unlawful for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  Bassett claims the City retaliated against her for asserting her rights under Title VII and the MHRA.  In our judgment, the facts we have set forth are sufficient to overcome a motion for summary judgment on the claim of retaliation.

To establish a prima facie case of retaliatory discrimination under Title VII and the MHRA, Bassett must show:  (1) she engaged in statutorily protected activity, (2) an adverse employment action was taken against her, and (3) a causal connection

---

[15]The ALJ's report is a ten page, single spaced document.  Many of his findings embellish the details of the episodes of the Roland-Bassett altercations.  Although we give no credence to this report or to the Commission's disagreement with it, we note the ALJ's conclusion that the City did not have "just cause" to terminate Bassett and that it was "reasonable to conclude that a personal dislike for Ms. Bassett . . . led Ms. Roland and others to take a position of waiting for Bassett to stumble further in some other fashion so that they could better justify her removal . . . ."  ALJ Findings of Fact, Conclusions and Recommendation at 8.  The ALJ's findings, following a three-day hearing, are germane to our determination that a disputed fact exists as to the City's reason for termination, namely deficient performance.  See Oldham v. West, 47 F.3d 985, 989 (8th Cir. 1995) (viewing ALJ's conclusions in favor of plaintiff as evidence that plaintiff established genuine issues of material fact to survive summary judgment).

-12-

between the two events.  See Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc) (citing Montandon v. Farmland Indus., Inc., 116 F.3d 355, 359 (8th Cir. 1997)).  The district court found Bassett proved the first and second elements of a prima facie case but failed to show a causal connection between the protected activity and adverse employment action.  The district court determined her claim of causal connection relied solely on the temporal proximity between her formal complaints and the City's adverse actions, and observed that the sequence of events supported a conclusion that Bassett filed her complaints in response to the City's disciplinary actions, not vice versa.  The court held that temporal proximity, without more, was insufficient to establish causality.

Contrary to the district court's observation, this court has found a temporal link between an EEOC charge and a negative evaluation sufficient to create an inference of retaliation.  See Mathews v. Trilogy Communications, Inc., 143 F.3d 1160, 1166 (8th Cir.1998) (time lapse of two months between protected activity and discharge may create inference of retaliatory motive); Keys v. Lutheran Family and Children's Servs. of Mo., 668 F.2d 356, 358 (8th Cir. 1981) (less than two months between protected activity and adverse employment action).  Such an inference is justified in this case.

The City concedes the first and second elements of Bassett's prima facie case.[16] It argues, however, that she failed to present evidence of a causal connection between

---

[16]Because the City conceded in its brief that Bassett satisfied the first and second elements, we do not determine here whether each complaint by Bassett constitutes "protected activity" or whether the corresponding negative acts by the City constitute "adverse action" as those terms are defined in Title VII retaliation cases.  There is no question, however, that termination is an adverse employment action and that a series of retaliatory conduct falling short of discharge or termination can, as a matter of law, constitute an adverse action.  See Kim v. Nash Finch Co., 123 F.3d 1046, 1060 (8th Cir. 1997) (reduction of duties, disciplinary action, negative personnel reports, "papering" a file, and employer-required remedial training that adversely affect or undermine employee's position constitute adverse employment action).

-13-

the events. Viewing the evidence in the light most favorable to Bassett and resolving all conflicts in the evidence in her favor, as we must, the record shows the following chronology of alleged protected activity and alleged retaliatory conduct:

1. Bassett filed a charge of discrimination on September 21, 1993. On October 25, 1993, Roland was notified of Bassett's charge and two weeks later gave her a negative performance evaluation.

2. Bassett filed a charge of discrimination on January 11, 1994. That same date, Roland knew of Bassett's charge and gave her two oral reprimands. Approximately six weeks later Roland issued her another oral reprimand.

3. On May 19, 1994, Bassett alleged four additional incidents of retaliation. Four days later, Captain Pufahl referred a complaint against Bassett to IAD resulting in a three-day suspension without pay for Bassett.

4. On September 27, 1994, Bassett filed a charge of race discrimination and reprisal, and on October 7, 1994, Roland referred another complaint to IAD.

5. On November 3, 1994, Bassett filed a charge of disability discrimination. On December 9, 1994, Bassett refused to voluntarily transfer out of the Program. Four days later, on December 12, 1994, Roland initiated an IAD complaint. Deputy Chief Jones reinitiated a pending IAD investigation.

6. Bassett filed charges of discrimination on January 13, 1995, and February 24, 1995. On May 15, 1995, Deputy Chief Jones sustained all but one of the charges in the four IAD complaints against Bassett and thereafter recommended termination.

Bassett's retaliation claims turn on whether she presented sufficient evidence of the causal connection between her protected activity and the City's adverse actions. After a careful review of the record, and providing Bassett the benefit of all reasonable inferences, we find Bassett presented sufficient evidence of such a connection to survive summary judgment. Although the district court correctly found that, on occasion, Bassett's charges of discrimination followed rather than preceded adverse employment action, giving her the benefit of all reasonable inferences, as is appropriate on summary judgment, the record provides sufficient evidence that the City engaged in retaliatory conduct <u>following</u> Bassett's protected activity.

In each of the above-stated instances, Roland or the City undertook acts against Bassett that arguably could be characterized as retaliatory. For example, Roland gave Bassett a favorable performance evaluation in December 1992, despite the fact that for six months Roland had meticulously documented Bassett's alleged aggressive behavior and negative effect on her peers and the Program. Less than two months after Roland discovered Bassett made an inquiry to the City's EEO Officer regarding seniority rights, Roland gave Bassett a written reprimand admonishing Bassett for her EEO inquiry and identifying performance deficiencies pre-dating her favorable performance evaluation. The reprimand also cites Bassett for a five-month backlog of contracts, despite the fact that (1) no established time standard for database entry existed until January 1994; (2) Roland denied Bassett's request for specialized database training in April 1993; and (3) a CAPRS computer was not readily available to Bassett until June 1993 – <u>a month after the reprimand</u>.

Unlike the employee in <u>Kneibert v. Thomson Newspapers, Michigan Inc.</u>, 129 F.3d 444 (8th Cir. 1997), who had received negative performance evaluations prior to his discrimination charge, Bassett received a favorable evaluation prior to contacting the City's EEO Officer. Only thereafter did Roland give Bassett a negative performance evaluation.

Giving Bassett the benefit of all favorable inferences, we believe a jury could find that the City imposed an increasing level of discipline for infractions similar to those of Bassett's peers who were not similarly disciplined, administered negative performance evaluations, denied her training opportunities and privileges afforded to her peers, and "papered" a file to support its ultimate recommendation of termination.

On this basis, we reverse and remand the grant of summary judgment for the City on Bassett's retaliation claim. Obviously, our decision is not a judgment on the merits. We merely find a genuine dispute of material fact; Bassett must still carry her burden of persuasion to a jury that the City retaliated against her for engaging in protected activity.

## B.  Racial Discrimination

The district court found that Bassett made a prima facie case of racial discrimination.[17]  The court found, however, that the City stated a nondiscriminatory reason for her termination, namely that she presented a disruptive presence in her job and that her job performance had been unsatisfactory.  Once such a reason is articulated, under the Supreme Court's analysis in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981), and St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993), the burden of production was placed on Bassett to show that the reasons given by the City were pretext for racial discrimination.  This court has addressed such analysis in Ryther v. KARE 11, 108 F.3d 832 (8th Cir. 1997) (en banc).  In that case, the court simply adopted the rationale set forth by the Supreme Court in Hicks and its predecessor cases.

[17]As the district court acknowledged, the City conceded that Bassett (1) was a member of the protected class, and (2) was qualified for her position and that despite her qualifications, adverse action was taken against her.

-16-

In passing on a motion for summary judgment, it is not the court's role to decide the merits. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986) (on motion of summary judgment, district court should not weigh evidence or attempt to determine truth of matter). The court must, as has often been stated, simply determine whether there exists a genuine dispute of material fact. In an employment discrimination case, if evidence of the employer's proffered reason for its action is undisputed, the movant is entitled to a grant of summary judgment. See Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970) (moving party has burden to show the absence of a genuine issue as to any material fact and "the material it lodged must be viewed in the light most favorable to the opposing party."). On the other hand, if the proffered reason is shown by conflicting evidence to be untrue, then the nonmoving party is entitled to all favorable inferences that the false reason given masks the real reason of intentional discrimination. See Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978).

Although the City provided a nondiscriminatory reason for Bassett's discharge, the question before us is whether the plaintiff has come forward with evidence of pretext showing that the reason articulated by the City is not the real reason for her discharge.[18] If Bassett's evidence is taken as true, a jury could well find that she was targeted for a discharge from the beginning. Under the existing record, we deem Bassett's claim demonstrates evidence of pretext for racial discrimination and raises a question as to whether her discharge was based upon racial discrimination.

The district court's opinion best sums up the theory of discrimination alleged by Bassett:

---

[18]See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 n.4 (1993) ("Even though (as we say here) rejection of the defendant's proffered reasons is enough at law to *sustain* a finding of discrimination, *there must be a finding of discrimination*.").

Bassett's basic contention is that she was specifically targeted for discipline by Roland and other city superiors, and that this targeting was motivated by her race. Bassett relies on evidence showing that she was sharply reprimanded for minor workplace rule infractions, denied personal requests granted to other specialists, and secretly taped by Roland when she talked with Roland on the phone. Bassett also contends that Roland "built a file" against her in order to justify any adverse employment decisions made by Roland and the city.

Dist. Ct. Op. at 7. There is sufficient case law to support Bassett's theory. See Kim v. Nash Finch Co., 123 F.3d 1046, 1066 (8th Cir. 1997) (considering evidence that employer attempted to discredit employee by "papering" his personnel file); Mays v. Williamson & Sons Janitorial Servs., Inc., 591 F. Supp. 1518, 1522 (E.D. Ark. 1984) (supervisor placing allegations of misconduct in employee's personnel file without notice to employee is "highly suspect practice"), aff'd, 775 F.2d 258 (8th Cir. 1985).

In considering Bassett's claim, the district court discounted the fact that a file was built on Bassett and not on others. The court then concluded that Bassett was a problematic employee and a disruptive force in the office environment. As our overall analysis has detailed, however, there is conflicting evidence as to whether Bassett was an unsatisfactory employee or whether Roland targeted her from the beginning of her employment. From nearly the first day of Bassett's employment, Roland built a personal file on Bassett – but did not initially maintain a similar file on the other three specialists until told to do so by City supervisors. The City's evidence of alleged misconduct relies heavily on Roland's personal notes which were written as much as six months after-the-fact and transcribed from an original calendar planner that Roland was unable to produce during discovery. These facts could weigh heavily in Bassett's favor as evidence of pretext for racial discrimination.

Additional evidence of pretext includes the allegation that Bassett was terminated because she had been disruptive at team meetings. A co-worker's affidavit, however, points out that because the specialists each worked in a separate precinct, the

team was not together very much. Indeed, team meetings had been discontinued in 1992 (with the exception of a few such meetings in 1993), nearly two years before Bassett's termination on June 5, 1995. Notwithstanding the allegation of disruptiveness at these team meetings in 1992 and early 1993, the MDCR notes that Roland wrote a review of Bassett on December 22, 1992, that stated Bassett "performs tasks of Juv[enile] Diversion Spec[ialist] well: assessing youth & parents, connecting them to needed services and doing follow-up paper work. Works hard at developing & maintaining positive team interactions." (emphasis added).

The district court credited the City's assertion that Bassett's work performance was deficient. Yet, a fair reading of the record shows that many of the deficiencies Roland pointed out were not accurate reflections of the situation. The grounds set forth in one reprimand included: (1) inaccurate information in Bassett's reports; (2) a five-month backlog on entering contracts into the CAPRS system; (3) closing a case without first discussing it with Roland, then not rewriting it as assigned; (4) insufficient contacts with Program youth; and (5) disrespectful behavior to co-workers and Roland. On each of these points, as noted earlier, there is evidence suggesting Roland unfairly scrutinized Bassett's work and singled her out for discipline when her co-specialists were guilty of the same alleged deficiencies but were not reprimanded.

There were many other incidents which cast doubt on Roland's treatment of Bassett. Bassett filed a worker's compensation claim following an automobile accident on August 20, 1993. The claim was denied on October 15, 1993, based on information provided by Roland to the City's Workers' Compensation Claim Coordinator suggesting that Bassett's injuries arose while Bassett was out-of-town on vacation. While Roland denied she initiated the contact with the workers' compensation office, the record reveals that the claim was denied, in part, because Bassett "personally informed her supervisor that the [vacation] car ride had affected her physical capabilities." Bassett denied that she ever made such a statement to Roland. Later, Bassett appealed the determination and was awarded benefits.

-19-

In another incident in December 1993, Bassett requested permission to work at home to care for her daughter following surgery. Roland denied Bassett's request, citing the City policy that employees are not normally allowed to work at home. Roland had, however, granted permission to a white male co-worker to work at home following his hospitalization.

Roland also required Bassett to expend vacation time to attend a work-related conference while allowing Isaacson, a white specialist, to attend on City time.[19] Roland further restricted Bassett from participating in a City-sanctioned quality initiative, Internal Consultants, after concluding that Bassett's request for parking reimbursement indicated that Bassett was spending too much time working with the initiative. Roland reached this conclusion despite undisputable evidence that Bassett had taken a leave of absence from working on the initiative prior to starting work for Roland in 1992.

Additionally, Roland informed Captain Jones that Bassett refused to engage in mediation. This too, however, misconstrues the record. Evidence suggests that meetings identified by Roland for the Program specialists were "team building" sessions involving all Program staff and even non-Program City employees. Contrary to Roland's suggestion that Bassett refused to mediate, the record reveals that Bassett repeatedly requested Roland provide her directives, standards, and work goals and

---

[19]There exists other evidence where Roland favored Isaacson over Bassett, notwithstanding Bassett's position as the most senior specialist. The City admits that during a time when Roland was absent, Isaacson was placed in "charge" of the Program, reviewing and assigning incoming cases. Roland defends this action by stating that she selected Isaacson because Isaacson had a smaller caseload than her co-workers. Bassett, however, contends this is further evidence of Roland's discriminatory animus because it is inconsistent with Roland's earlier assertion that Bassett carried the smallest caseload, and was the least productive specialist. Following this incident, Roland rotated the responsibility of acting in her absence between all specialists.

initiated several requests for a "buffer" between she and Roland–requests that went unanswered by City supervisors.

Space does not permit us to detail the record further. We merely highlight that evidence which casts doubt on the veracity of the alleged nondiscriminatory reason proffered by the City.

The question is whether Bassett's theory is substantiated by the record such that a jury can find, based upon the proof of the elements of the prima facie case and evidence of pretext as to the City's claim of poor job performance, that intentional discrimination is proven. That question remains and must be determined by a finder of fact making important credibility determinations. We do not decide that question now. At this early stage of summary judgment we are only concerned with whether there is evidence in the record that the City's proffered reasons for its actions may be pretext for racial discrimination. We find from a thorough reading of the record that Bassett has demonstrated a genuine dispute of material fact that only a jury should decide. We, therefore, reverse the grant of summary judgment for the City and remand the case for a plenary trial to the district court.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.