Leland W. SIMS, Jr., Plaintiff,

v.

CHEZIK/SAYERS IOWA, INC., d/b/a
Chezik–Sayers Imports,
Defendant.

No. 3:03–CV–40050.

United States District Court,
S.D. Iowa,
Davenport Division.

March 22, 2005.

Iris E. Muchmore, Leonard T. Strand, Simmons Perrine Albright & Ellwood, Cedar Rapids, IA, for Defendant.

## ORDER

GRITZNER, District Judge.

This matter is before the Court on Defendant's Motion for Summary Judgment. Defendant moved for summary judgment on Plaintiff's claims on September 30, 2004. Neither party requested a hearing, and the Court finds that a hearing is unnecessary. The matter is now fully submitted for review. For the reasons discussed below, Defendant's Motion for Summary Judgment must be granted.

## I. SUMMARY OF MATERIAL FACTS

Defendant Chezik/Sayers, Inc. ("Chezik"), operates a Honda dealership in Iowa City, Iowa. A separate company, AutoBanc of Lisbon, Inc., d/b/a Chezik–Sayers Imports ("AutoBanc") sells other lines of automobiles at an adjacent location.

Plaintiff Leland Sims Jr. ("Sims") was employed by Chezik as a sales consultant on two separate occasions, from 1989 through 1991 and from 1998 through 2002. Jon Bell served as General Manager of Chezik and as Vice President of AutoBanc. Upon Bell's recommendation, Sims was rehired as a Honda sales consultant in 1998. Sims was approximately 51 years old at that time.

Sims claims that in 2000, Bell told him that when the dealership added a new automobile line, Sims was in line for a promotion. In early 2002, AutoBanc acquired franchises for the sale of Volvo and Mercedes–Benz automobiles. Sims contends that when the Volvo franchise was purchased, Bell told him that after he learned all of the elements of the Volvo franchise, he would be promoted to sales manager of that franchise. Sims contends that he was in fact promoted to new car coordinator of the Volvo line in the Spring of 2002.

A new car coordinator is a salesperson who takes on added duties such as arranging dealer trades and inventory, whereas a sales manager is responsible for inventory control, sales volume, promotional items, and the personnel selling cars. The new car coordinator position is subordinate to the sales manager position.

Bell stated in his own deposition testimony that when Sims came to him and expressed an interest in being the Volvo manager, Bell told him that they had not yet acquired the Volvo deal, but that he would take Sims' desire to be the Volvo manager under consideration. Bell stated that he had a subsequent conversation with Mr. John Chezik, the owner of the dealership, in which Mr. Chezik indicated that Sims had also approached him and expressed a desire to be the Volvo manager. Bell told Mr. Chezik he was aware Sims wanted to be the Volvo manager, and that Sims would be under consideration; however, they had not yet decided who they were going to put in that position. Bell also stated that Eric Davenport ("Davenport"), the Honda sales manager, had recommended against placing Sims in the Volvo manager position because Davenport questioned Sims' ability to do the job based on his lack of experience in finance and management. Bell also stated that some other members of the dealership staff had questioned the idea of placing Sims in the Volvo manager position.

Bell testified that after his conversation with Mr. Chezik about Sims' interest in the Volvo manager position, he had no other conversations with Sims about the position. Bell indicated that he did have conversations with Sims about selling Volvos in which he informed Sims that if he was interested in going into management and wanted to go to Volvo, Sims would have to be a good Volvo salesperson and learn all the Volvo communication systems. Bell testified that Sims was being trained with regard to the Volvo line in anticipation of possibly becoming a new coordinator for that line.

Sims began his Volvo training in February of 2002. In early April of 2002, Sims suffered a non-work related back injury, and consequently, from April 7, 2002, through May 7, 2002, Sims missed work due to a medical leave. Sims asserts that when he returned to work, Bell advised him that he had decided to have another employee, Josh Hicks, handle the manager position of the Volvo franchise and that

Bell wanted Sims to return to his position as a Honda sales consultant.

Hicks had been employed with Chezik since 1999 and prior to going into the Volvo position was a Honda sales consultant. Hicks is approximately 30 years younger than Sims.

On May 22, 2002, Sims and Bell had another conversation during which, according to Sims, Bell gave him two choices: Sims could either go back to selling Hondas or stay at Volvo and work under Hicks. Sims became frustrated and angry and reacted by demanding what had been "promised" to him. Bell testified during his deposition that when he asked Sims if he was refusing to sell Hondas, Sims responded with profanity, stating, "I want the [expletive] job I was promised." Bell interpreted Sims' response of demanding the Volvo position as a refusal to perform the job that Sims had been assigned and therefore told Sims that he was accepting Sims' resignation. On May 31, 2002, Sims submitted a written resignation letter to Chezik, in which he stated,

It is with deep personal sadness that I submit this forced resignation. There is no other dealership for which I would rather work, but this does not seem to be possible any more. Here is the resignation which you demanded. I am very sorry you have chosen to end it like this.

On July 31, 2002, Sims filed complaints with the Iowa Civil Rights Commission and the Equal Opportunity Employment Commission, contending that he had been discriminated against due to age and perceived physical disability and that he had been retaliated against. Sims stated in his complaint, "My resignation was demanded in retaliation for my request that management fulfill promises made to me." Sims obtained right-to-sue letters from each agency.

On February 5, 2003, Bell, acting on behalf of Chezik, sent a letter to Sims which read as follows:

The purposes of this letter is twofold. First, I want to confirm that on May 22, 2002, I accepted your resignation as a Honda salesperson. At the time of your resignation, you were fully allowed to continue with the Chezik organization as a Honda salesperson on the same terms and conditions as your employment had been for many years.

The second reason for this letter is to extend to you an unconditional offer to return to the Chezik organization as a Honda salesperson and resume your former position at its former pay including benefits. The terms of your employment would remain the same as they had been at that position, which assumes compliance with company guidelines which have not changed during your absence.

If you decide to accept this position, you may commence your employment any time prior to February 15, 2003. Please let me know 48 hours in advance if you intend to return so that appropriate arrangements can be made. In the event we do not hear from you, we will assume you have no interest in returning to this position.

In order to indicate his lack of acceptance of this employment offer, Sims did not respond to this letter.

On April 28, 2003, Sims filed suit in the Iowa District Court for Johnson County. Sims asserted two counts of age discrimination, one arising under the Iowa Civil Rights Act and one under the Age Discrimination in Employment Act. On May 30, 2003, Chezik removed the action to this Court pursuant to 28 U.S.C. §§ 1441 and 1446. Chezik responded to Sims' complaint, asserting that no promises were

ever made to Sims regarding his employment and that Sims was not terminated.

On September 30, 2004, Chezik moved for summary judgment on all claims. Chezik contends that as a matter of law, Sims cannot meet his burden of proving that Chezik discriminated against him based on his age, arguing there is no evidence of pretext or age discrimination. Sims resists Chezik's motion for summary judgment, claiming that the evidence is sufficient to prove a reasonable inference of age discrimination.

## II. APPLICABLE LAW AND DISCUSSION

### A. Standard of Review

"[C]laims lacking merit may be dealt with through summary judgment under Rule 56." *Swierkiewicz v. Sorema*, 534 U.S. 506, 122 S.Ct. 992, 998–999, 152 L.Ed.2d 1 (2002). Summary judgment is a drastic remedy, and the Eighth Circuit has recognized that it "must be exercised with extreme care to prevent taking genuine issues of fact away from juries." *Wabun–Inini v. Sessions*, 900 F.2d 1234, 1238 (8th Cir.1990). "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Herring v. Canada Life Assur. Co.*, 207 F.3d 1026, 1029 (8th Cir.2000). Summary judgment should seldom be granted in employment cases. *Bassett v. City of Minneapolis*, 211 F.3d 1097 (8th Cir.2000).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion and identifying those portions of the rec-

ord which show a lack of a genuine issue." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir.1992) (citing *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548); *see also Shelter Ins. Companies v. Hildreth*, 255 F.3d 921, 924 (8th Cir.2001); *McGee v. Broz*, 251 F.3d 750, 752 (8th Cir.2001). Once the moving party has carried its burden, the opponent must show that a genuine issue of material facts exists. *Nat'l Bank of Commerce of El Dorado, Ark. v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir.1999). The Court gives the nonmoving party the benefit of all reasonable inferences and views the facts in the light most favorable to that party. *de Llano v. Berglund*, 282 F.3d 1031, 1034 (8th Cir.2002); *Pace v. City of Des Moines*, 201 F.3d 1050, 1052 (8th Cir.2000); *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir.1997).

"Summary judgment is proper if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law." *Shelton v. ContiGroup Companies, Inc.*, 285 F.3d 640, 642 (8th Cir.2002) (citing *Henerey v. City of St. Charles*, 200 F.3d 1128, 1131 (8th Cir.1999)). Summary judgment should not be granted if the Court can conclude that a reasonable trier of fact could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Burk v. Beene*, 948 F.2d 489, 492 (8th Cir.1991). In light of these standards, the Court considers the present motion.

### B. ADEA Discrimination Claim

■ "The ADEA makes it unlawful for an employer to discriminate against an employee on the basis of the employee's age if the employee is 40 years of age or older." *Hitt v. Harsco Corp.*, 356 F.3d

920, 924 (8th Cir.2004); *see also* 29 U.S.C.A. § 631.

> The plaintiff must first establish a prima facie case that the defendant violated the statute. To make such a case under the ADEA, the plaintiff must ordinarily show that: (1) he is a member of a protected age group; (2) he was performing his job at a level that met his employer's legitimate expectations; (3) he was discharged; and (4) he was replaced by a younger worker.

*Hitt*, 356 F.3d at 924. In the present case, Sims could satisfy his prima facie case by showing either that he was discharged from his employment with Chezik or that he was not hired for the Volvo position despite being sufficiently qualified. *Simonson v. Trinity Regional Health System*, 336 F.3d 706, 710 (8th Cir.2003).

Chezik is willing to assume for the purposes of its summary judgment motion that Sims can establish the elements of his prima facie case. Thus, the burden shifts to Chezik to produce a legitimate, nondiscriminatory reason for deciding not to place Sims in the Volvo manager position. *Hesse v. Avis Rent A Car Sys., Inc.*, 394 F.3d 624, 631 (8th Cir.2005).

Chezik states that Bell expected the salesperson handling the coordinator duties would be able to accomplish those duties while also maintaining a high level of sales. Josh Hicks, who performed the coordinator duties while Sims was on medical leave, was able to continue selling cars at the same rate while learning the Volvo product as he had before taking over the coordinator duties, while Sims, by contrast, admits that he sold cars at an unacceptable level while attempting to learn the Volvo product and that he experienced such a decrease in sales volume that Chezik paid him $2,000 in supplemental compensation to make up for his lost commission. Bell testified that he did not want to put Sims back into a position where he would contin-

ually be asking Bell for additional, supplemental compensation due to lack of sales. Bell further testified that other salespeople who have handled the coordinator duties have, like Hicks, been able to perform those duties while still selling a high volume of cars. Bell denied that Hicks' age or experience played a role in the decision and also denied that he ever made any comments to Sims suggesting that age was a factor in the analysis. Chezik states that ultimately Sims was not given the Volvo manager position because he was unable to continue selling an acceptable volume of cars while simultaneously learning the Volvo product line. Chezik has articulated a legitimate, nondiscriminatory reason for not giving Sims the job.

> If the employer provides a non-discriminatory reason, the presumption of discrimination disappears, and the plaintiff can only avoid summary judgment if he or she presents evidence that considered in its entirety, (1) creates a question of material fact as to whether the defendant's proffered reasons are pretextual and (2) creates a reasonable inference that age was a determinative factor in the adverse employment decision.

*Kohrt v. MidAmerican Energy Co.*, 364 F.3d 894, 897 (8th Cir.2004). In support of his contention that a question of material fact exists regarding whether Chezik's proffered reason was pretextual, Sims claims that he was not given a fair opportunity.

First, Sims contends that he was restricted to selling Volvos and Hondas to repeat customers only. Sims asserts that, in contrast, Hicks was allowed to sell both Hondas and Volvos. Davenport testified that once Sims went to Volvo, Sims could sell Hondas to repeat customers only and Sims could not have taken a new Honda customer. Sims explained that because he was assigned to Volvo and was supposed to

be training on the Volvo product, he was not to be spending his time on the Honda sales floor soliciting new customers and was thus restricted to selling Hondas to repeat customers only. There is no indication that Sims was similarly limited to selling Volvos only to repeat customers. The record shows that Hicks was allowed to sell both Hondas and Volvos; however, there is no assertion in the record that Hicks, like Sims, was to be spending the majority of his time training on the Volvo line. Restricting Hicks to a specific sales floor was therefore not necessary.

Second, Sims asserts that between February 2002. when the Volvos arrived, and early April when he went on medical leave, Chezik did not install any Volvo signage, did not advertise the Volvos, and had not yet acquired access to Volvo's computer training system. Sims argues that without advertising and signage, the dealership's only Volvo customers were those who had called Arenson Chevrolet to inquire about a Volvo.

Bell testified that temporary signage was in fact utilized, stating that signage was placed on the window of the Volvo dealership's building. Chezik's advertising and budget forecasts for February, March, and April of 2002 show that although less than the amount budgeted for April advertising, some money was budgeted for advertising in February and March.

Sims is essentially arguing that he was held to the same standard as Hicks but was provided with much less opportunity than was Hicks and thus his performance was not evaluated fairly. While Sims contends these alleged deficiencies in signage and advertising affected his ability to sell, he has failed to explain how such deficiencies, if they indeed existed, would not have similarly affected Hicks' ability to sell the same product. In any event, "[i]n considering the pretext issue, [this Court's] inquiry is limited to whether the employer gave an honest explanation of its behavior, not whether its action was wise, fair, or correct." *McKay v. U.S. Dept. of Transp.*, 340 F.3d 695, 700 (8th Cir.2003) (quoting *Harvey v. Anheuser–Busch, Inc.*, 38 F.3d 968, 973 (8th Cir.1994)) (quotation omitted). Assuming in the light most favorable to Sims that his description of the facts is accurate, the Court's examination is limited to whether Chezik's explanation of why it choose to give the position to Hicks instead of Sims was honest. Sims has failed to show or even create an inference that Chezik's explanation is dishonest. Further, to the extent that any subjectivity entered into the evaluation of Sims and Hicks and they were not evaluated fairly, "the presence of subjectivity in employee evaluations is itself not a grounds for challenging those evaluations as discriminatory." *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 780 (8th Cir.1995); *see also Simmons v. Oce–USA, Inc.*, 174 F.3d 913, 915 (8th Cir.1999).

During his deposition, Sims was asked specifically what position he was contending Bell promised to him.

Q. I understand it's your contention that you were promised a position that you didn't get. Would you explain to me what position you are contending you were promised.

A. My understanding was that I was *being considered* based on a number of factors for a management position with the Volvo franchise.

Def.App. p. 36, Sims dep. p. 55, ll. 14–20 (emphasis added). Sims went on to say that he just had a good-faith expectation he was being considered for the position. Further questioning regarding the promise that was made resulted in the following exchange:

Q. You haven't told me any promise that was made. You've said you understood you were being consid-

ered and what I want to know is did someone promise you the job?

A. Yes. The day that Jon Bell sat me in his office and said that I have second thoughts about this but I'm going to put you—you're going to be running that store or words to that effect. I don't remember if he said "managing" or "running" or "in charge of" or whatever, it's going to be your deal, but you've got to do this training first and you've got to be able to continue to sell cars, you have to prove to me that you can do this and then it will be yours. I take that as a promise.

Q. So you had to do the training and you had to learn the product and you had to keep selling cars, all those things had to be done?

A. Right.

Def.App. p. 37, Sims dep. p. 57, ll. 8–23. Sims' own deposition testimony indicates that if any promise was made, it was contingent upon Sims' completing the Volvo training and learning the Volvo product while continuing to sell an acceptable number of vehicles; and Sims himself stated in his Statement of Undisputed Facts that the factor for Bell in deciding to promote Hicks to Volvo car coordinator was that Hicks learned the mechanics of the process, communicated it well, and continued to sell cars at the same time. Indeed, Chezik's sales records show that in January, February, and March of 2002, Hicks consistently outsold Sims, with Hicks selling nineteen vehicles in January, ten vehicles in February, and sixteen vehicles in March, while Sims only sold 8 vehicles in January, four vehicles in February, and eight vehicles in March.

■ While an argument may be offered that a head-to-head comparison of sales by Sims and Hicks involves some unfairness due to differing personal circumstances, that does not create the essential factual dispute. In the exercise of normal business judgment, Chezik management could have recognized the differing circumstances would contribute to some variation, but still have been impressed with the ability of Hicks to perform additional responsibilities while still generating substantial revenue.[1] The Court does not evaluate the quality of that business judgment but looks for evidence of pretext. Sims has failed to present sufficient evidence to create a question of material fact as to whether Chezik's proffered reason for its employment decision was pretextual.

Assuming Sims could establish that Chezik's proffered reason for offering the position to Hicks instead of Sims was dishonest, Sims would also need to show that the explanation was a pretext for age discrimination. *Kohrt*, 364 F.3d at 898; *Spencer v. Stuart Hall Co., Inc.*, 173 F.3d 1124, 1128 (8th Cir.1999). "It is not enough, in other words, to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination." *Hicks v. St. Mary's Honor Ctr., Div. of Adult Inst. of Dept. of Corr. & Human Res. of State of Mo.*, 2 F.3d 265, 266 (8th Cir.1993) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). To satisfy this burden, Sims asserts that statements made by Bell at the time he told Sims of his decision to give the position to Hicks provides an indication of how Sims' age factored in the decision.

■ Sims first points to his deposition testimony, in which he paraphrases a statement he claims Bell made on the date

---

**1.** This must also be coupled with negative considerations that may have discouraged management from promoting Sims, as discussed in the Summary of Material Facts.

Bell informed him he would not be placed in the position. Sims testified that Bell stated, "I have to look to the future of this company. I think that this young man will provide ... a better service for this dealership in the years to come, so you're out and he's in." Describing Hicks, a man who was in his mid-twenties at the time the comment was allegedly made, as a "young man" is an accurate description which amounts to nothing more than a stray remark. *Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1438–39 (9th Cir. 1990) (comment that another individual was selected for employment because he was "a bright, intelligent, knowledgeable young man" is a stray remark). "Stray remarks made in the workplace are not sufficient to establish a claim of discrimination." *Simmons*, 174 F.3d at 915; *see also Bialas v. Greyhound Lines, Inc.*, 59 F.3d 759, 763 (8th Cir.1995) (fact that employee's eventual replacement was described by decision makers as "a young man" does not lead to an inference that the employee was discharged because of his age). Reference to Hicks as a "young man," even taken in consideration with the context of the conversation in which the comment was allegedly made, is insufficient to satisfy Sims' burden of creating a reasonable inference that age was a determinative factor in Chezik's decision not to give Sims the position.

Finally, Sims contends that Bell referenced his age and physical condition as being detrimental to his ability to run the Volvo department. In support of this contention, Sims relies on the following excerpt from his own deposition testimony:

Q. What is the basis for your belief that you had been discriminated against because of a, quote, "Perceived physical disability"?

A. Mr. Bell expressed concern that my health problems might cause problems in attendance and function after my return to work.

Q. And when did he express that concern?

A. The morning that he let me know that I was being replaced in that position.

Q. Specifically, what did he say?

A. His words were, "I have to look to the future of this company. I think that this young man will provide bet -" I'm paraphrasing. "Provide a better service for this dealership in the years to come, so you're out and he's in."

Q. And from that statement you conclude that he was expressing concern that your health problems might be a problem in the future?

A. He made illusions to the fact that my absence was caused by a physical problem.

Q. Specifically, what did he say?

A. I don't remember the exact words.

Q. Was this when you returned?

A. Yes.

Q. Do you have any memory of the general terms that he used?

A. In general terms he expressed concern about my physical health and my age being a deterrent to the efficient running of that department.

Q. Specifically, what did he say?

A. I don't remember specifics. I can give you a general statement that reflects the exact words that he said. I do not remember the exact words.

Q. Did he say, "I hope you're better now that you're back?" Or when you say—for example, I often express concern in employees in my

office when they've been sick that I hope they're feeling better. Is that what he said?

A. He said, "Are you better now?"

Q. Okay.

A. And I said, "I've been cleared to return to work by my physician and my orthopedic surgeon with a clean bill of health."

Q. And is that the expression of concern about your physical health that you were referring to?

A. It's concern that it might become a problem in the future again.

Q. Well, how did he—what did he specifically say to you?

A. Again, I don't remember the specific words that he used.

Q. What did he say about your age, if anything?

A. He kept referring to my being replaced by this young man, and placing a younger man in his position was a phrase that he used at one point. I don't remember the exact context.

Q. Is it your testimony there were two references to the term "young"?, one where he said, "The young -" "This young man will provide better service," and then another where he talked about a younger man? Is that your -

A. Yes.

Q. testimony? So there were two references to the word "young"?

A. Yes.

Q. There was no reference to your age specifically but rather a reference to a young man or a younger person? Is that your testimony?

A. That's correct. In this conversation, yes, that's correct.

Def.App. p. 45, Sims dep. p. 17, l. 9—p. 19, l. 23. Clearly, even assuming in the light most favorable to Sims that his testimony accurately depicts what was said by Bell, this falls short of Bell referencing Sims' age and physical condition as being detrimental to his ability to run the Volvo department and fails to satisfy Sims' burden of producing evidence that shows Chezik's proffered reason for the adverse employment decision was merely a pretext for age discrimination.

Examining Chezik's ultimate hiring decision for the Volvo sales manager position, based on the relative qualifications of Sims and Hicks, would require the Court to evaluate the business decisions of Chezik. The Court declines to do so. Where Chezik's business decision concerning hiring for the Volvo position was not motivated by Sims' age, and there is no evidence in the present case that it was, the Court does not second guess the employer's business judgment.

Chezik is willing to assume for purposes of its summary judgment motion that Sims can establish his prima facie case. However, even assuming that Sims could establish his prima facie case, Chezik has offered a legitimate, nondiscriminatory reason for choosing to give the position to Hicks instead of Sims, and Sims is unable to demonstrate that a genuine issue exists regarding whether Chezik's proffered reason for this employment decision was a pretext for unlawful age discrimination.

## C. ICRA Age Discrimination Claim

"The ICRA is interpreted to mirror federal law, including the ADEA." *Fisher v. Pharmacia & Upjohn*, 225 F.3d 915, 919 n. 2 (8th Cir.2000). Where a plaintiff does not present separate arguments under the ICRA, state civil rights claims are addressed together with Title VII claims. *Hannoon v. Fawn Eng'g Corp.*, 324 F.3d 1041, 1046 (8th Cir.2003) (citing *Iowa State Fairgrounds Sec. v. Iowa Civil Rights*

*Comm'n*, 322 N.W.2d 293, 296 (Iowa 1982)) (federal cases persuasive in selecting the analytical framework for deciding discrimination cases under the ICRA); *see also Mercer v. City of Cedar Rapids*, 308 F.3d 840, 846 n. 2 (2002). Because Sims' claim under Iowa Code § 216 is premised on the same factual bases as his ADEA claim, it must also fail.

## III.  CONCLUSION

The Court finds there is no genuine issue of material fact on the essential claims, and judgment may be entered as a matter of law. Chezik's Motion for Summary Judgment [Clerk's No. 13] must be granted.

**IT IS SO ORDERED.**