Danuta FALCZYNSKI, Appellant,

v.

AMOCO OIL COMPANY, d/b/a Amoco Customer Service Center, Appellee.

No. 93–1575.

Supreme Court of Iowa.

May 24, 1995.

Roxanne Barton Conlin of Roxanne Barton Conlin Law Firm, and Jacqueline Jorgensen, Des Moines, for appellant.

Michael A. Warner and Elizabeth Skalitzky of Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, and Gene R. LaSuer and Sharon K. Malheiro of Davis, Hockenberg, Wine, Brown, Koehn & Shors, P.C., Des Moines, for appellee.

Considered by McGIVERIN, C.J., and HARRIS, LARSON, SNELL, and TERNUS, JJ.

McGIVERIN, Chief Justice.

Danuta Falczynski brought this action against her former employer, Amoco Oil Company, claiming national origin discrimination, disability discrimination, and breach of contract of employment.

In a bench trial, the district court tried the case as a law action and rejected each of plaintiff Falczynski's claims. We affirm the district court's judgment regarding the national origin discrimination claims and the implied contract of employment claim because we find no error in those rulings. However, we reverse and remand the district court's judgment regarding the disability discrimination claim because in making its determination the district court failed to follow the correct legal analysis.

I. *Background facts and proceedings.* Plaintiff, Danuta Falczynski, immigrated to the United States from her native Poland in 1984.

In June 1988 the defendant, Amoco Oil Company (Amoco), hired Falczynski as a non-exempt or hourly employee to work in the general ledger section of its accounting department as an accounting clerk. She worked in this capacity for Amoco for almost two years and received two "satisfactory" performance evaluations.

In spite of these ratings, Falczynski's skill level was not what Amoco expected, and she had difficulty getting her work completed in a timely fashion. Recognizing this, some of Amoco's supervisors decided she could do better at repetitive work, and, accordingly, on April 30, 1990 transferred her to the capital investment section of Amoco's accounting department to perform computer data entry work. In doing so, Amoco made an exception in order to allow the plaintiff to remain at her then current pay and benefit level.

Feeling she was qualified to perform accounting work, Falczynski was not happy with the transfer. She was also unhappy with her new supervisor, Helen Rode. She described Rode as a tough and demanding supervisor who was mean to her and other minorities. At one time in 1990, Falczynski and another Amoco employee of Laotian background went to the human resources department and lodged a complaint against

Rode. Although neither employee reported instances of Rode making overt references to their national origin nor examples of Rode's specific behavior, they stated that they felt that they were treated differently than other nonforeign-born Amoco employees.

Besides plaintiff's alleged problems with her immediate supervisor Rode, she also had problems with her health. In 1989, she began experiencing problems with her lungs. Between March 1989 and December 1989, while plaintiff was still working in Amoco's general ledger section as an accounting clerk, she had approximately ten medical appointments. Her family physician, Dr. Kelly Bast, initially diagnosed her illness as bronchitis and allergies, but he was unable to prescribe a treatment that could alleviate her symptoms. The plaintiff also visited Amoco's company nurse, Jennifer Borst, several times and complained of shortness of breath, pleuritic chest pain, heart pain, and chest burning.

Suffering from these symptoms and seeking an effective treatment, the plaintiff often missed work to stay home or attend medical appointments. Between January 1990 and October 1990, the plaintiff was absent from work for varying periods of time on the following dates:

| | |
|---|---|
| —January 17–24 | —April 11 |
| —April 26 | —May 1 |
| —May 3–4 | —May 17 |
| —May 24 | —June 14 |
| —June 24–26 | —July 13 |
| —August 16 | —September 5–7 |
| —September 13–24 | —October 2 |

Throughout Falczynski's employment with Amoco, Amoco had in force an attendance policy that applied to all non-exempt Amoco employees such as Falczynski. The policy was premised on the concept of an "occasion," which was defined as an absence from work for a period of time greater than sixty minutes. If an employee was absent for a consecutive period of time due to a specific illness, however, the entire consecutive period was counted as one "occasion." The policy provided that employees could make up absences in the same week as they occurred to avoid having them counted as an "occasion."

Under this attendance policy, an employee who accrued four or five "occasions" of absence during a twelve-month period was subject to informal counseling and an employee who accrued seven "occasions" of absence during that same time period was subject to a formal warning letter. Once an employee accrued eight "occasions" of absences during a twelve-month period, the employee was subject to termination.

Throughout 1990, Falczynski's immediate supervisor, Rode, both informally and formally counseled Falczynski regarding these attendance requirements and the fact that Falczynski's attendance problem threatened her continued employment with Amoco. Rode encouraged Falczynski to make up some of the missed time on evenings or weekends in order to avoid violating Amoco's attendance policy.

On August 10, 1990, when Falczynski had accrued ten "occasions" of absence, Rode and one of Amoco's human resources representatives, Mark Giorgini, met with Falczynski and again reviewed the attendance policy with her. Giorgini and Rode warned the plaintiff that she could be terminated if her attendance problem persisted. Also, on August 15, 1990, Giorgini discussed with Falczynski the possibility of taking paid sick and disability leave or unpaid medical leave.

On September 10, 1990, at which time Falczynski had twelve "occasions" of absence, she received and signed a written warning letter from Rode. Through the letter, Rode informed Falczynski that time away from work would have to be made up in order to avoid further "occasions" of absence. The letter further advised her that failure to follow the letter's instructions could be grounds for immediate termination.

After Falczynski received the warning letter, she accrued two more "occasions" of absence, making a total of fourteen for the year. Amoco then terminated Falczynski on October 16, 1990. Amoco's stated reason for the termination was Falczynski's violation of its attendance policy.

Later in October 1990, Falczynski's illness was diagnosed as an atypical form of asthma.

Following her termination, Falczynski brought three types of claims against Amoco: (1) claims of national origin discrimination under the Iowa civil rights statute, Iowa Code chapter 601A (1989),[1] and under Title VII of the Civil Rights Act of 1964, 42 U.S.C. sections 2000e—2000e–17 (1988); (2) a claim of disability discrimination under Iowa Code chapter 601A; and (3) a claim of breach of contract of employment based on Iowa case law.

These law action claims were tried to the court without a jury. The trial court dismissed all of the claims, generally concluding that Amoco terminated Falczynski's employment because of her excessive absenteeism in violation of its policy rather than because of her national origin or any disability, and that Amoco's policies were not sufficiently definite in their terms to create an offer of continued employment.

Plaintiff appealed and assigns error concerning the trial court's findings and conclusions as to each of her claims.

**II.** *Scope of review.* Our review of discrimination claims tried to the court is at law. *Boelman v. Manson State Bank,* 522 N.W.2d 73, 76 (Iowa 1994) (citation omitted). Likewise, our review of breach of implied or unilateral contract of employment claims tried to the court is for correction of errors at law. *See Fogel v. Trustees of Iowa College,* 446 N.W.2d 451, 456 (Iowa 1989); *see also* Iowa R.App.P. 4.

In our review, we are bound by the trial court's findings of fact if they are supported by substantial evidence. *Boelman,* 522 N.W.2d at 76 (citing Iowa R.App.P. 14(f)(1)). Evidence is substantial for purposes of sustaining a finding of fact when a reasonable mind would accept it as adequate to reach a conclusion. *Hamer v. Iowa Civil Rights Comm'n,* 472 N.W.2d 259, 261 (Iowa 1991). When reviewing evidence for its substantiality, we view it in the light most favorable to upholding the trial court's judgment. *Boelman,* 522 N.W.2d at 76.

Moreover, when the trial court following a bench trial has denied recovery because a party failed to sustain its burden of proof on an issue, we will not interfere with the trial court's judgment unless we find the party has carried its burden as a matter of law. *Schmitz v. Crotty,* 528 N.W.2d 112, 115 (Iowa 1995) (citation omitted); *see also Hamer,* 472 N.W.2d at 261. We will conclude a party has carried such a burden only when evidence is so overwhelming that only one reasonable inference on each critical fact issue can be drawn. *Schmitz,* 528 N.W.2d at 115.

We are not bound, however, by the trial court's application of legal principles or its conclusions of law. *Vaughn v. Ag Processing, Inc.,* 459 N.W.2d 627, 632 (Iowa 1990) (citation omitted). When the trial court has applied erroneous rules of law which materially affected its decision, we will reverse. *See Blunt, Ellis & Loewi, Inc. v. Igram,* 319 N.W.2d 189, 192 (Iowa 1982).

**III.** *National origin discrimination claims.* Plaintiff first contends that her former employer, defendant Amoco, terminated her employment with it for the discriminatory reason of her Polish origin. The plaintiff bases her national origin discrimination claims on the Iowa civil rights act, then Iowa Code chapter 601A, specifically section 601A.6(1)(a) (now Iowa Code section 216.6(1)(a) (1995)), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. sections 2000e—2000e–17, specifically section 2000e–2(a)(1).[2] Among other things, these statutes prohibit any person from discriminating in employment against any employee because of national origin. *See Hy–Vee Food Stores v. Civil Rights Comm'n,* 453 N.W.2d 512, 516 (Iowa 1990).

The plaintiff argues that the trial court erred as a matter of law by concluding that she did not establish a prima facie case of national origin discrimination. The defendant, on the other hand, maintains that the trial court correctly determined that plaintiff

---

1. Chapter 601A is now codified at Iowa Code chapter 216 (1995).

2. Our analysis of the discrimination claims under state and federal law are the same. *Hy–Vee Food Stores v. Civil Rights Comm'n,* 453 N.W.2d 512, 516 (Iowa 1990).

failed to meet her burden because the plaintiff was not qualified to retain her employment due to excessive absenteeism. We agree with the defendant because substantial evidence supports the trial court's conclusions.

■ A. *Elements and proof burden of a prima facie case of discriminatory treatment.* The trial court correctly set out the elements of a prima facie case of national origin discrimination based on discriminatory treatment.[3] To establish a prima facie case of discrimination for an existing employee/employer relationship, the plaintiff must show by a preponderance of the evidence that: (1) she belongs to a protected group; (2) she was qualified to retain the job; (3) she was terminated; and (4) it is more likely than not that the termination was based on an impermissible consideration, in this case national origin. *See Hamer,* 472 N.W.2d at 264 (citing *Reeb v. Marshall,* 626 F.2d 43, 45 (8th Cir.1980)); *see also Hy–Vee Food Stores,* 453 N.W.2d at 516 (citation omitted).

B. *Sufficiency of the evidence.* The trial court concluded that the plaintiff clearly met the first and third elements of her case, and neither party disputes those conclusions.

The parties do disagree, however, on whether the trial court correctly determined that plaintiff failed to prove the other two elements by a preponderance of the evidence. We conclude the trial's court's determinations regarding elements (2) and (4) were not erroneous. Substantial evidence supports the trial court's conclusion that plaintiff was not qualified to retain her position with Amoco because she violated Amoco's attendance policy and that it was not more likely that plaintiff's termination was based on her Polish origin than on her excessive absenteeism in violation of Amoco's attendance policy.

■ 1. *Plaintiff's qualification.* In order to determine whether a person is qualified for a given job in the context of a national origin discrimination case, the fact finder must decide whether the plaintiff can perform the essential functions of the job. *Cf. Boelman,* 522 N.W.2d at 80. The "essential functions" of the job are those that "bear more than a marginal relationship to the job at issue." *Id.* (quoting *Chandler v. City of Dallas,* 2 F.3d 1385, 1393 (5th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1386, 128 L.Ed.2d 61 (1994)). If the plaintiff proves she can perform the essential functions of the job, then she is qualified. *Boelman,* 522 N.W.2d at 80.

■ Substantial evidence supports the trial court's determination that Falczynski's excessive absenteeism prevented her from performing the essential functions of her computer data entry job with Amoco.

During the period in question, Falczynski worked as one of two data entry clerks in the capital investments section of Amoco's accounting department. She was responsible for timely keying into the computer vouchers and journal entries so that checks for vendors could be generated and Amoco's assets could be properly capitalized.

Between January 1990 and October 1990, Falczynski was absent from her job on fourteen "occasions." Plaintiff was absent from January 17–24, 1990 due to illness. On April 11, 1990, shortly after her transfer to the capital investments section, she was absent for four hours. On April 26, 1990, plaintiff missed four hours of work for a doctor's appointment. On May 1, 1990, Falczynski was absent for an entire day due to illness. On May 3 and 4, 1990, Falczynski missed two days for tests at a local hospital. On May 17, 1990, she missed 3.7 hours for another doctor's appointment. On May 24, 1990, Falczynski missed eight hours of work due to illness. On June 14, 1990, Falczynski was gone from work for 2.20 hours for a doctor's appointment. She was also absent for 14.5 hours between June 24 to June 26, 1990 due to illness. On July 13, 1990, Falczynski was absent for four hours for a doctor's appointment. On August 9, 1990, she missed two hours for a doctor's appointment. On August 16, 1990, Falczynski was absent for 3.5

---

**3.** The district court did not apply the alternative disparate impact model of proof. *See, e.g., Hy–Vee Food Stores v. Civil Rights Comm'n,* 453 N.W.2d 512, 516–19 (Iowa 1990). Likewise, we only address the disparate treatment model of proof because the plaintiff does not argue that the disparate impact model should have been applied to these claims.

hours for a doctor's appointment. She was out sick again from September 5–7, 1990. She was absent for fifty-one hours from September 13–24 due to illness, as well. Finally, she missed eight hours of work to undergo tests at the University of Iowa Hospital on October 2, 1990.

During these absences, plaintiff's immediate supervisor, Helen Rode, was forced to redistribute Falczynski's work to the other data entry operator. The other data operator testified, however, that she had difficulty completing the work normally performed by Falczynski, in addition to performing her normal assignment. Rode also had to pull an associate off of her position to fill in when Falczynski was gone. This arrangement in turn disrupted the associate's ability to perform her regular assignment. Further, Rode testified that in May and June 1990, Falczynski was absent at a critical time, during the final weeks of the month when the department is responsible for closing accounts.

As her work had to be completed by other employees, Falczynski's chronic absenteeism plainly prevented her from performing the essential functions of her job. Indeed, she could not perform the quintessential function of regularly attending work. *Cf. Wimbley v. Bolger,* 642 F.Supp. 481, 485 (W.D.Tenn. 1986) (stating an employee "who does not come to work cannot perform *any* of his job functions, essential or otherwise"), *aff'd,* 831 F.2d 298 (6th Cir.1987).

Other jurisdictions agree that irregular attendance renders a person unqualified for most types of employment and thus susceptible to legitimate termination. *Cf. Carr v. Reno,* 23 F.3d 525, 529–30 (D.C.Cir.1994) (affirming district court's holding that plaintiff's prolonged, frequent, and unpredictable absences rendered her unqualified for any government job because "coming to work regularly" is an "essential function"); *Tyndall v. National Educ. Ctrs. Inc. of California,* 31 F.3d 209, 213 (4th Cir.1994) (holding that even though instructor possessed the necessary teaching skills and performed well when she was at work, her "frequent absences rendered her unable to function effectively as a teacher"); *Tuttle v. Henry J. Kaiser Co.,*

921 F.2d 183, 187 (8th Cir.1990) (holding attendance problem was a legitimate basis for an employer's termination of an employee); *Santiago v. Temple Univ.,* 739 F.Supp. 974, 979 (E.D.Pa.1990) (concluding that "[a]n employee ... cannot be qualified for his position if he is unable to attend the workplace to perform the required duties, because attendance is necessarily the fundamental prerequisite to job qualification"), *aff'd,* 928 F.2d 396 (3rd Cir.1991). *See generally* 15 Am.Jur.2d *Civil Rights* § 148, 614 (1976) (stating that an employer may discharge an employee for excessive absenteeism).

■ 2. *Basis for termination.* In addition to concluding plaintiff failed to establish the qualification element, the trial court also concluded that the plaintiff failed to prove the fourth element of a prima facie case of discrimination: that it was more likely than not that her termination was based on the impermissible consideration of her Polish origin than on her excessive absenteeism. Once again, the record contains substantial evidence, primarily evidence of Amoco's response to plaintiff's continued absences, in support of the trial court's conclusion.

As described in detail above, the plaintiff had fourteen "occasions" of absence from work between January and October 1990. Under Amoco's attendance policy, an employee with eight "occasions" of absence within a twelve-month period may be terminated. On the basis of the policy, Amoco therefore could have ended plaintiff's employment once she accrued her eighth "occasion" of the year on June 14, 1990.

Instead, Amoco initially responded by informally and formally counseling the plaintiff on her attendance problem and its consequences. Plaintiff's immediate supervisor Rode talked with the plaintiff several times. Then, after the plaintiff had been absent on nine "occasions," Rode formally counseled her regarding Amoco's attendance requirements and the fact that her chronic attendance problem threatened her continued employment. Rode encouraged Falczynski to make up some of the missed time either before or after regular work hours or on weekends to avoid violating the policy. The

plaintiff did not make up enough hours of work to avoid the accrued "occasions." [4]

Besides Rode's discussions with the plaintiff, one of Amoco's human resources representatives, Mark Giorgini, met with Falczynski and talked with her about her attendance at work. Along with Rode, he reviewed the attendance policy with Falczynski and cautioned her that she could be terminated for accruing too many "occasions." At a subsequent meeting with Falczynski, Giorgini also mentioned options such as paid sick and disability leave and unpaid medical leave.

In addition to counseling, Amoco gave Falczynski the option of working an alternative schedule from 7:00 a.m. until 3:45 p.m., which would have allowed her additional time to schedule doctor's appointments in the afternoon to avoid missing work. Falczynski actually did work this schedule for awhile, but she had to switch back to the normal work schedule of 7:45 a.m. to 4:30 p.m. when she repeatedly failed to arrive for work on time for the 7:00 a.m. schedule.

Following an absence from September 5–7, 1990, which resulted in the plaintiff having a record of twelve "occasions" for the year, Rode gave Falczynski a written warning letter regarding her attendance problem, which Falczynski received and signed. The letter advised her to make up the time to avoid incurring additional absences and that any further absences could result in her discharge.

After the written warning, the plaintiff accrued two more "occasions" of absence reaching the total of fourteen. Shortly thereafter, on October 16, 1990, Amoco terminated Falczynski for the stated reason of violation of the company's attendance policy.

Amoco's handling of plaintiff's attendance problem provides substantial evidence that Amoco did not fire the plaintiff for the illegitimate reason of her Polish origin. *See Naraine v. Western Elec. Co.*, 507 F.2d 590, 593–94 (8th Cir.1974) (relying on evidence that employee had indulged in absenteeism from inception of employment in sustaining determination of non-racially motivated discharge).

Plaintiff argues, however, that Amoco treated her differently than other nonforeign-born employees, primarily by the manner in which the company defined, applied and enforced its attendance policy. She contends that certain other similarly situated Amoco employees having multiple hours of absence and numerous occasions of absence were technically in violation of Amoco's attendance policy but were not terminated. She maintains that this difference in treatment was the result of Rode's refusal to count some of the plaintiff's absences, which were nonconsecutive in terms of time away from work but consecutive in the sense of being caused by the same illness, as one "occasion." She insists that if Rode would have exercised her alleged discretion to count her absences as consecutive, as other supervisors allegedly did for other Amoco employees, the plaintiff would not have accrued a sufficient number of "occasions" for termination under Amoco's attendance policy.

The district court rejected plaintiff's argument, finding no evidence that Amoco had ever treated nonconsecutive absences caused by an illness, such as cancer, as a single "occasion." Indeed, none of the Amoco employees involved in plaintiff's termination had ever applied the attendance policy in such a manner, although they speculated that it would be possible where an employee required regular, predictable treatment for a defined period of time. Furthermore, not until after Amoco terminated Falczynski did Amoco promulgate a revised attendance policy pursuant to which supervisors were given explicit authority to treat related absences as one "occasion."

Based on this evidence, the trial court concluded that "the employer applied its absentee policy evenly and fairly and not in a discriminatory fashion." Because a reasonable fact finder could also conclude that it was more likely than not that Amoco termi-

---

**4.** The parties dispute whether the plaintiff could attend her medical appointments during non-working hours and whether the plaintiff's doctors requested that she not make up any work on weeknights and weekends. The trial court did not explicitly resolve these factual issues and, in any event, their resolution is irrelevant to plaintiff's national origin discrimination claims.

nated the plaintiff for an excessive absenteeism rate in violation of its attendance policy rather than because of her Polish origin, we agree with the trial court's conclusion.

In sum, we conclude that substantial evidence supports the trial court's conclusions that plaintiff failed to meet two elements of a prima facie case of national origin discrimination. Correspondingly, plaintiff also has failed to prove her claims as a matter of law. Thus, we affirm the trial court's dismissal of her state and federal discrimination claims based on national origin.

IV. *Disability discrimination claim.* Plaintiff next contends that defendant Amoco's termination of her employment constituted disability discrimination in violation of Iowa Code section 601A.6(1)(a) (now Iowa Code section 216.6(1)(a) (1995)). Specifically, Falczynski asserts that Amoco wrongly terminated her because of her absences from work, which absences were a consequence of problems with her lungs.

The trial court impliedly found and concluded that Amoco terminated plaintiff due to plaintiff's excessive absenteeism. The court stated it therefore did not decide whether Falczynski was disabled. In making its determination, however, the trial court failed to follow the appropriate legal analysis for a disability discrimination claim. As this constituted reversible error, we must reverse the court's dismissal of the plaintiff's disability discrimination claim and remand for reconsideration based on the existing record.

■ Regarding the proper analytical framework for disability discrimination claims, we have previously stated that the threshold determination [5] is whether the person was disabled. *Henkel Corp. v. Iowa Civil Rights Comm'n,* 471 N.W.2d 806, 809 (Iowa 1991). The status of the person as having been disabled must be determined at the outset in order for that person to qualify as a member of a protected group and thus be subject to the protections afforded by the

Iowa civil rights act. *Id.; see* Iowa Code § 610A.6(1)(a) (now Iowa Code § 216.6(1)(a) (1995)). In this case, the trial court explicitly refused to determine whether the plaintiff proved by a preponderance of the evidence that her condition, eventually diagnosed as an atypical form of asthma, qualified as a disability. By failing to make this threshold determination, the trial court's legal analysis was therefore inherently flawed.

■ We further note that the trial court assumed the proof model for plaintiff's disability discrimination claim was the same as the model followed for her national origin discrimination claims. However, in a recent decision, *Boelman v. Manson State Bank,* 522 N.W.2d 73, 79–80 (Iowa 1994), we developed a different proof model to be used in disability discrimination claims where the employee's disability and the basis for the employee's discharge are inherently connected.[6] The burden of proving a prima facie case of discrimination by a preponderance of the evidence still rests with the plaintiff, but we have adapted the elements of a prima facie case for disability discrimination claims in which the employer admittedly discharged the employee because of the disability. *See id.*

Following these principles on remand, the trial court must make the threshold inquiry of whether the plaintiff has proved by a preponderance of the evidence that she was disabled. *See Henkel,* 471 N.W.2d at 809. If the court finds plaintiff was not disabled, the court, as fact finder, need go no further. *See Probasco v. Iowa Civil Rights Comm'n,* 420 N.W.2d 432 (Iowa 1988).

On the other hand, if the trial court finds the plaintiff was disabled, it must also determine whether plaintiff made her disability known to her employer before her discharge. *Cf. Fogel v. Trustees of Iowa College,* 446 N.W.2d 451, 454 (Iowa 1989) (stating former employee "never told either his supervisors

---

**5.** Under principles we shall later discuss, cases can be imagined that could be summarily resolved by determining that the plaintiff did not make the claimed disability known to the employer. We do not hold it would be error, in such a case, to proceed directly to that determi-

nation, without first resolving the threshold question.

**6.** In fairness to the district court, we note that we had not yet decided *Boelman* when the district court entered judgment in the present case.

or any other college personnel that he was disabled" in concluding employee did not establish a prima facie case of disability discrimination); Iowa Admin.Code 161–8.27(6) (1994) (stating "[a]n employer shall make reasonable accommodation to the known physical or mental limitations of an otherwise qualified handicapped applicant or employee ...."); *see also Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 931–34 (7th Cir.1995) (refusing to impute knowledge of former employee's disability to employer unless the employee had symptoms which were obvious manifestations of the disability and upholding summary judgment in favor of former employer because employer "knew nothing of the disability"); *Kimbro v. Atlantic Richfield Co.*, 889 F.2d 869, 875–77 (9th Cir.1989) (acknowledging "lack of knowledge of the disability" defense but holding that former employee's supervisor's acquired knowledge of employee's condition and duty to communicate such knowledge to management established former employer's notice of employee's disability as a matter of law); *Schmidt v. Safeway Inc.*, 864 F.Supp. 991, 997 (D.Or. 1994) (stating Americans with Disabilities Act (ADA) "does not require [an employee] to speak any magic words before [the employee] is subject to its protections," and holding that because employer knew underlying facts of former employee's alcohol problem, employer knew about employee's disability). If the court finds that she did, then the court must continue to follow the applicable disability discrimination proof model in *Hamer v. Iowa Civil Rights Commission*, 472 N.W.2d 259, 264 (Iowa 1991), as it may be modified by our recent decision in *Boelman*, depending on the contentions of the parties and the applicable record.

With these instructions, we therefore reverse and remand for the trial court to reconsider the plaintiff's disability discrimination claim on the present record.

■ V. *Contract of employment claim.* Plaintiff's final claim is that an implied em-

ployment contract [7] existed between her and Amoco as a result of Amoco's attendance, nondiscrimination, and other policies and that Amoco breached that alleged employment contract when it terminated her employment. The trial court found and concluded that non-exempt Amoco employees, such as Falczynski, were employees at will and could be terminated at will. Therefore, the court found plaintiff's contract claim to be without merit, and we agree.

■ In order for an employer's policies to rise to the level of an employment contract, three elements must be met: (1) the policy must be sufficiently definite in its terms to create an offer; (2) the policy must have been communicated to and accepted by the employee so as to create an acceptance; and (3) the employee must have continued working, so as to provide consideration. *Cf. Fogel*, 446 N.W.2d at 456 (citing *McBride v. City of Sioux City*, 444 N.W.2d 85, 91 (Iowa 1989)).

■ Following these elements, the starting point of the unilateral contract inquiry is whether the terms of the policies are sufficiently definite to constitute an offer of continued employment. *Id.* In making this inquiry, the trial court concluded that:

> The written policies of the company concerning attendance and nondiscrimination are not sufficiently definite in their terms to create an offer of employment to satisfy the requirements [for a unilateral employment contract].

Having found the plaintiff failed to meet the first element of her contractual claim, the trial court dismissed it. We have reviewed the policies in the record and agree with the trial court's conclusion. Accordingly, we affirm its dismissal of her contractual claim.

VI. *Conclusion.* In view of the record in this case, we uphold the trial court's dismissal of plaintiff's national origin discrimination claims and its dismissal of her contract claim.

---

7.  Plaintiff characterized her contract claim as an implied rather than an unilateral contract claim. *See McBride v. City of Sioux City*, 444 N.W.2d 85, 90–91 (Iowa 1989) (discussing implied contract of employment and unilateral contract of employment in separate analyses). Yet because the

plaintiff urged the analytical framework for an unilateral contract of employment in her brief and the trial court employed unilateral contractual analysis in its decision, we analyze plaintiff's contract claim as a unilateral contract claim.

However, due to the trial court's incorrect analysis of the plaintiff's disability discrimination claim, we reverse the trial court's dismissal of that claim and remand with instructions for the trial court's reconsideration of the disability discrimination claim based on the present record consistent with this opinion.

Under our view of the case, we need not consider other contentions made by the parties. Costs shall be taxed two-thirds to plaintiff and one-third to defendant.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**