Korte Jerome MCGREGORY, Plaintiff,

v.

CREST/HUGHES TECHNOLOGIES, Jim Schwebach, and Ron Myers, Defendants.

No. CIV 4–99–CV–20626.

United States District Court, S.D. Iowa, Central Division.

April 25, 2001.

Charles E. Gribble, Ivy Ross Rivello, Parrish Krruidenier Moss Dunn & Montgomery LLP, Des Moines, IA, for Plaintiff.

Kevin J. Visser, Thomas D. Wolle, Moyer & Bergman, Cedar Rapids, IA, for Defendants.

## ORDER ON DEFENDANTS' MOTION ·FOR SUMMARY JUDGMENT

BREMER, United States Magistrate Judge.

This matter comes before the Court on Defendants' Motion for Summary Judgment (Clerk's No. 17), filed January 23, 2001. Plaintiff filed an Amended Resistance to the Motion (Clerk's No. 28) on March 19, 2001. A hearing was held March 28, 2001. The parties consented to proceed before a United States Magistrate Judge under 28 U.S.C. § 636(c). The Motion is fully submitted.

Plaintiff asserts claims against Defendants for race discrimination in violation of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e (1994 & West Supp.1999) (Count I), and in violation of the Iowa Civil Rights Act (ICRA), chapter 216 of the Iowa Code (Count II). Specifically, Plaintiff asserts Defendants created a hostile work environment, demoted him, and discharged him based on his race. Plaintiff also claims that when he complained about the discrimination, Defendants retaliated against him in violation of Title VII (Count III) and in violation of the ICRA (Count IV).

In their Motion for Summary Judgment, Defendants argue the following: Plaintiff cannot establish a prima facie case of racial discrimination; Plaintiff presents insufficient evidence to show Defendants' legitimate, nondiscriminatory reasons for their actions were a pretext for unlawful discrimination; and Defendants Jim Schwebach and Ron Myers, cannot be held individually liable under Title VII.

## SUMMARY JUDGMENT STANDARD

After filing a motion for summary judgment, the moving party bears the initial burden of showing no genuine issues of material fact remain for trial, and that it is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Estate of Gavin v. United States*, 113 F.3d 802, 805 (8th Cir.1997); *Honeywell, Inc. v. United States*, 973 F.2d 638, 641 (8th Cir.1992). On a motion for summary judgment, a court must consider the facts and inferences to be drawn in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court must also resolve all conflicts in the evidence in favor of the nonmovant. *Bassett v. City of Minneapolis*, 211 F.3d 1097, 1105 (8th Cir.2000).

"Because discrimination cases often depend on inferences rather than on direct evidence, summary judgment should not be granted unless the evidence could not support any reasonable inference for the nonmovant." *Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir.1994). However, summary judgment is proper if the plaintiff fails to make a showing sufficient to establish any element of his or her prima

facie case. *See Celotex,* 477 U.S. at 322, 106 S.Ct. 2548; *Wilking v. County of Ramsey,* 153 F.3d 869, 873 (8th Cir.1998).

## FACTS

The following facts are undisputed, or are viewed in the light most favorable to the nonmoving party.

Plaintiff Korte McGregory (McGregory), an African–American male, is a resident of Des Moines, Polk County, Iowa. In October 1996, McGregory filled out an application form for a job at Defendant Crest/ Hughes Technologies (Crest).[1] Crest stores and retrieves the records of private companies and public institutions using a variety of media.

McGregory was first interviewed by Defendant Schwebach, the company's vice president.[2] McGregory testified that during the interview, he felt that he was not going to be hired because of his race. McGregory's reaction was based on Schwebach's demeanor, comments, and lack of interest, despite the fact that McGregory was qualified for the position. Schwebach did not hire McGregory.

Over a week later, McGregory received a call from Crest inviting him to interview with Operations Manager Fannette Elliott, who also is African–American. Crest had lost McGregory's application, so he filled out another one. During the interview, Elliott wrote down all McGregory's answers to her questions, gave McGregory a tour of the facilities, and offered him a position. McGregory began work the next day, October 9, 1996.

McGregory was hired as a retrieval clerk, and Elliott supervised him. At the time, Elliott, McGregory, and his sister were the company's only African–American employees. When McGregory saw Schwebach after being hired, McGregory believed Schwebach looked surprised to see him, and McGregory testified he sensed a "weird reaction" from Schwebach. (McGregory Dep. at 301.) From then on, McGregory believed Schwebach was watching him closely.

One time, Schwebach commented to McGregory, "Hey, you're growing a beard. You're so dark, I can't tell where your beard stops and your skin starts." (McGregory Dep. at 249–50.) McGregory considered Schwebach's remark strange and derogatory. McGregory testified that sometimes Schwebach rubbed McGregory's head, feeling his hair's texture, and that McGregory told Schwebach to stop rubbing his hair.

On April 28, 1997, Elliott, with the consultation of Schwebach, her supervisor, promoted McGregory, to a Team Lead position. Sometime later, Elliott promoted McGregory to the position of Business Segment Team Lead.

Elliott stated that McGregory was a good trainer and his work was timely and accurate, but that he had some performance problems. Elliott wrote up McGregory for many infractions, including tardiness, disorganization, absenteeism, and questioning managers' decisions. She based some write-ups on complaints reported by others, including Schwebach. McGregory testified that Renee Rocha, an employee whom he supervised, told him Schwebach hired her to find out if McGregory was doing anything wrong and report back to him.

1. Crest Information Technologies, Inc., bought Hughes Image Systems on November 1, 1998, and then became known as Crest/ Hughes. In May 1999, Crest/Hughes was purchased by Lason, Inc.

2. Schwebach managed the operations of the Des Moines office until April 1998, when Myers was hired to fill that position. From April 1998 until the present, Schwebach has been the Sales Manager.

As the write-ups accumulated, McGregory met with Elliott and asked her what was the basis for all of the write-ups. McGregory asked Elliott, "Who is pulling your chain? Who is making you do this stuff?" (McGregory Dep. at 167–68.) Elliott grew upset, left the room and brought back Schwebach. McGregory testified that Schwebach did not deny McGregory's claim nor answer McGregory's questions, but instead asked where McGregory got the idea that someone was influencing Elliott. They met for approximately an hour.

On March 24, 1998, based on certain employees' accusations, Elliott sent McGregory a memorandum regarding performance concerns. Elliott later learned that some complaints stated in the memorandum were false. As a result, Elliott conducted an investigation in May and June 1998 to determine the accuracy of complaints she was getting concerning McGregory. After talking with team leaders, Elliott believed some of the performance concerns she previously had reported about McGregory, based on employee's accusations, were unfounded. During her investigation, Elliott learned that Schwebach and Myers had directed Rocha, Alma Basic, and Amra Karajcaca[3], all of whom Elliott supervised, to report complaints about McGregory to Schwebach or Myers rather than to Elliott. No evidence indicates Schwebach and Myers told employees to report any other worker's wrongdoings to them, rather than to the worker's supervisor. Elliott stated that the two managers created a racist climate and were "out to get" McGregory. (Elliott Dep. at 42–45.) Concerning certain charges Rocha made against McGregory, Elliott concluded Rocha was untruthful. After the investigation, Elliott resolved to personally investigate all future complaints about McGregory before writing reports based on them.

On approximately September 22, 1998, Schwebach met with Ferrol Wiley, rather than McGregory, Wiley's supervisor, explaining that, "I don't want to go through the monkey chain of command," and laughing. (Elliott Dep. at 59.) Wiley made a written note of the incident and reported Schwebach's comment to McGregory. Believing the comment referred to him and was racially derogatory, McGregory was offended and complained to Elliott who, in turn, reported the comment to Myers.

On September 23, 1998, McGregory was placed on probation. (Defs.' Ex. 18.) Myers outlined the terms. The reasons cited included McGregory's lack of adherence to company attendance policies, lack of respect towards management, lack of consistent treatment over those he supervised, and lack of ability to handle confidential information. McGregory testified that the complaints were fabricated, and so vague and unspecific that McGregory could not respond to them. McGregory testified at his deposition that Elliott investigated the complaints after McGregory was put on probation, and found many were fabricated.

On September 28, 1998, Myers called a meeting with McGregory, Schwebach, Elliott, and Jill Petermeier, Director of Human Resources, to address Schwebach's "monkey" comment. At the meeting, Schwebach stated he did not believe the comment was race-based or derogatory, whereas McGregory said it could be taken as a racial remark. Myers said Schwebach's use of the word "monkey" was not meant to be racial, however it was inappro-

---

**3.** According to the attorney in Elliott's deposition, the correct spelling is "Karajcaca." (Elliott Dep. at 43.) In McGregory's deposition, the name is spelled "Karajicka," (McGregory Dep. at 183, line 1), and "Karajica," (id. at line 14).

priate. Myers told Schwebach not to use the term in the future.

A few days later, at a meeting including Schwebach and McGregory, Schwebach referred to McGregory as "Korte the monkey," and said, "we'll put the monkey on Korte's back." (McGregory Dep. at 221.) The meeting halted. McGregory left the room and Elliott followed him to talk. Schwebach came out and asked McGregory to his office, where McGregory told Schwebach that he was offending him again. Schwebach apologized, and said the phrase was taken from the game a Barrel of Monkeys and was common usage. McGregory said the word "monkey" was degrading to him, and he felt uncomfortable around Schwebach—he did not know how Schwebach would address him in front of other employees. McGregory testified that he put his complaint in writing and expressed his complaint verbally to Elliott.

Soon after the meeting, Schwebach consulted a lawyer. Elliott testified that Schwebach told her the lawyer advised him not to use the word "monkey" again in McGregory's presence, but that it would be possible to inflame McGregory, provoking him to insubordination, and then fire him. (Elliott Dep. at 65.)

McGregory tried to "figure out some way of mediating [Schwebach's] problem" with him. (McGregory Dep. at 367.) McGregory sought a mediator, called the employee assistance program, and called several people before getting a lawyer. McGregory began avoiding Schwebach. McGregory did not hear the supervisor again use the word "monkey" or any other racial remarks. Schwebach received no discipline for his use of the word "monkey," or his interactions with McGregory.

Elliott testified that Schwebach made discriminatory comments about Indians and told her all the stereotypes regarding Indians, to which Elliott responded, "that's

discrimination. I can't talk about a group of people like that." (Elliott Dep. at 78.)

Elliott testified in her deposition that other team leaders with performance problems equal to McGregory's were not fired or subjected to the same level of disciplinary action as was McGregory, and that McGregory was treated differently than other employees based on his race. Elliott stated that, in her opinion, McGregory's performance problems did not justify firing him, that he "got the job done." (Elliott Dep. at 73.)

McGregory testified that he was a good employee. He managed a multi-million-dollar account. McGregory was given an additional million-dollar account to manage when another team leader was having problems with it. McGregory supervised between 50 and 150 employees at various times. .

In November 1998, after the Crest/Hughes merger, McGregory met the new company's owner, Jay Johnson. McGregory testified that when he introduced himself and extended his hand, Johnson would not shake his hand. Shortly thereafter, McGregory met with another Crest manager, Carolyn Frazier, who also would not shake his hand, McGregory testified. On several occasions, Frazier ignored McGregory and spoke to McGregory's team members instead of to him.

McGregory testified that at some point, he saw Elliott and Schwebach remove three or four write-ups from his file after the supervisors learned he was correct in contending the write-ups were invalid. McGregory asserts he received this remedy after debating "for hours" with the supervisors. (McGregory Dep. at 319.)

In January 1999, Crest initiated a corporate reorganization. Crest eliminated Elliott's job and discharged her on January 5, 1999. A few days later, Myers demoted

McGregory back into retrievals, where Rocha became his new supervisor. McGregory's salary was not reduced as a result of the demotion.

After McGregory's demotion, he requested a job description from Rocha, Schwebach and Myers. McGregory testified that he never received a job description. Instead, he was instructed on a semi-daily basis as to what he was to do. His duties consisted primarily of sitting at a reader printer and making copies of customers' receipts, balance transfers, and other records.

McGregory testified in his deposition that when he complained to Myers about the demotion and asked what he lacked to be considered for a supervisory job, Myers said only that McGregory had "too much negative and not enough positive." *Id.* at 274. McGregory testified he told Myers he took the statement to mean "that I have too much black and not enough white," and Myers did not respond. *Id.* at 275. When McGregory tried to talk to Schwebach about the demotion, McGregory testified, Schwebach refused to talk with him. McGregory then complained to Petermeier, but she said she could not do anything—she had nothing to do with the decision.

On January 29, 1999, McGregory filed charges of employment discrimination against Defendants with the Iowa Civil Rights Commission and the Equal Employment Opportunity Commission (EEOC).

McGregory contends that Schwebach and Myers promoted three or four employees whom McGregory previously supervised, to positions higher than his in retrievals.

McGregory testified that after Rocha became his supervisor, the trumped-up write-ups against him became more frequent and more outlandish, and they continued for the duration of his employment. To protect himself from false complaints, McGregory recorded his conversations with Rocha in a diary.

For three days, on approximately Monday through Wednesday, July 5 through 7, 1999,[4] McGregory was absent from work without an excuse. Crest's conduct policy states as follows:

8.6 Absence Without Notice

For Crest Information Technologies, Inc.[,] to operate our business effectively, we ask that you keep us informed of your status when you are off work because of illness or accident from any cause. If you fail to notify us after three days of consecutive absence, we will presume you have resigned, and you will be removed from the payroll. Likewise, you must call your supervisor daily while off work due to short-term illness or accident, or we will presume you have resigned and you will be removed from the payroll.

Amend. Doc. Evid. Support Defs.' Mot. Summ. J. at 2.

On July 8, 1999, Rebecca Goldin, the head of Human Resources for Crest's midwestern region, was notified that McGregory had been absent three consecutive days without notice. Goldin read McGregory's file, noting the write-ups for absences and other infractions. She called McGregory's supervisors, who said they had not heard from McGregory. Goldin stated in her affidavit, "We assumed he had quit," based on his three-day absence with no notice. (Goldin Aff. at 2.) Goldin

---

**4.** The record is unclear as to the dates, which may have been Tuesday through Thursday, July 6 through 8, 1999.

wrote McGregory a severance letter and removed him from the payroll.

McGregory filed the present action on November 4, 1999. He testified at his deposition on Tuesday, April 25, 2000, as follows:

Q. (Wolle): So your termination of employment was not discriminatory, was it?

A. (McGregory): I never said it was. No, it's not. That portion, no.

Q. The fact that you were no longer employed at Crest/Hughes is not because of any alleged race discrimination of them, is that correct?

A. I'm not sure I understand your question.

Q. You were terminated by Crest/Hughes because you failed to call in or report to work for three consecutive days, correct?

A. That's correct, yeah. Well, that's what they wrote.

Q. Well, is that true or is that not true, that you were terminated because you did not show up for work or report that you were going to miss work for three consecutive days?

A. Well, that's what they say, but I—

Q. I know that's what they say. My question to you is whether or not you disagree with that?

A. I quit.

Q. Okay.

A. I quit.

Q. And your quitting—you don't attribute your quitting to race discrimination on the part of Crest/Hughes, right?

A. I attribute my quitting to, yeah, the treatment of me while I was there, yes, I do. But they attribute it to my three days of not calling in. Well, I quit.

Q. Why did you quit?

A. Because of the treatment and the discrimination that I received while I was there.

McGregory Dep. at 128–29.

After he left Crest, McGregory requested a copy of his employment file. He testified the file contained at least two write-ups that he knew nothing about, and that were based on false information.

## DISCUSSION

### I. Disparate Treatment Claims

Under Title VII, it is unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a). Similarly, the ICRA makes it unlawful for an employer to "discharge any employee, or to otherwise discriminate in employment against any applicant for employment or any employee because of the age, race, creed, color, sex, national origin, religion, or disability ...." Iowa Code § 216.6. Courts apply the same analysis under the ICRA as under Title VII. *Falczynski v. Amoco Oil Co.,* 533 N.W.2d 226, 230 n. 2 (Iowa 1995).

The three-stage burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), governs McGregory's discrimination claim, because his claim is based on inferences to be drawn from circumstantial evidence. *See McDonnell Douglas,* 411 U.S. at 802–04, 93 S.Ct. 1817. Under *McDonnell Douglas,* "the plaintiff bears the burden of establishing a prima facie case of discrimination, which has the effect of creating a legal presumption of unlawful discrimination." *Ghane v. West,* 148 F.3d 979, 981 (8th Cir.1998). Once the plaintiff makes a prima facie case, the

burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. If the defendant advances such a nondiscriminatory reason, the plaintiff must prove that the defendant's proffered reason is a pretext for illegal discrimination. *Ruby v. Springfield R–12 Public School Dist.*, 76 F.3d 909, 911 (8th Cir. 1996).

## A. Discriminatory Discharge

 Defendants assert that summary judgment is appropriate on this claim because McGregory cannot establish a prima facie case of discrimination. To establish a prima facie case of discrimination in a case such as this under Title VII, a plaintiff must show the following: (1) he is a member of a protected class; (2) he is qualified for the position; (3) adverse action was taken against him; and (4) that action occurred in circumstances giving rise to an inference of discriminatory motivation. *McDonnell Douglas*, 411 U.S. at 802–804, 93 S.Ct. 1817.

With regards to the third prima facie component, Defendants assert that McGregory has not established an adverse employment action, in that he quit and cannot show he was constructively discharged. McGregory counters that he is not asserting a constructive-discharge claim. McGregory alleges in his complaint that he was terminated due to unlawful race discrimination.

In his deposition, however, McGregory testified that he quit because of the discrimination to which he was subjected at work. (McGregory Dep. at 128–29.) McGregory's evidence that he was discharged, on the other hand, is Goldin's affidavit statement that she terminated him and the fact that Goldin wrote McGregory a separation letter. The Court must decide whether McGregory's evidence is sufficient to generate a genuine disputed factual issue concerning whether Crest discharged him, or whether, as he testified, he quit.

McGregory does not dispute that Goldin wrote the separation letter after he was absent without notice for three consecutive work days. Under Crest's policy, McGregory's three-day absence without contact served as notification to Crest of his resignation. After receiving this notice, Goldin wrote a separation letter. At the hearing on the Motion for Summary Judgment, McGregory argued that Crest's policy applies to new employees, not to employees such as he, who had worked for the company for several years. The policy's plain language, however, does not support this argument. McGregory, moreover, has offered no evidence that Defendants construed their policy differently with him than with any similarly situated employee. Considering McGregory's three-day absence without notice, and his testimony that he quit, the Court holds that Goldin's formal action taken to remove McGregory from the payroll after his three-day absence is insufficient to raise a genuine issue of fact regarding whether McGregory was discharged.

The Court holds that McGregory has failed to establish his prima facie case of discriminatory discharge.

## B. Discriminatory Demotion

### 1. Prima Facie Case

Defendants assert that McGregory has not established a prima facie case of discriminatory demotion. To establish a prima facie case of discriminatory demotion, a plaintiff must show the same four elements outlined above. *See McDonnell Douglas*, 411 U.S. at 802–04, 93 S.Ct. 1817.

 For the second element of his prima facie case, McGregory must show he was qualified for the job. *See id.* A prima

facie showing can be made "through credible evidence that a plaintiff was qualified even if that evidence was disputed by the employer, and ... this burden may be met through the plaintiff's own testimony and that of co-workers who were in a position to know the plaintiff's qualifications." *Lyoch v. Anheuser–Busch Companies, Inc.,* 139 F.3d 612, 615 (8th Cir.1998); *Thomas v. Denny's, Inc.,* 111 F.3d 1506, 1510 (10th Cir.1997).

Elliott, McGregory's supervisor, testified that McGregory's work was timely and the quality satisfactory. The quality of McGregory's work was so good that he was put in control of a multi-million-dollar account and, concurrently, was asked to take over another team leader's million-dollar account. McGregory has established the second prima facie component of his discriminatory demotion claim.

■ The third prima facie element requires a materially adverse employment action. *Manning v. Metropolitan Life Ins. Co.,* 127 F.3d 686, 692 (8th Cir.1997). McGregory's demotion in January 1999 resulted in a job with significantly reduced duties. Although his salary remained the same after the demotion as it was before, McGregory no longer supervised employees. Having no job description, McGregory received instruction on a semi-daily basis concerning his assigned tasks. These indices are sufficient to establish the third element of McGregory's claim. *Compare Davis v. City of Sioux City,* 115 F.3d 1365, 1369 (8th Cir.1997) (upholding jury determination that job transfer was adverse action, despite salary increase, when new job lacked supervisory status, had fewer opportunities for salary increases, and offered little chance for advancement) *with Manning,* 127 F.3d at 692 (holding hostility and personal animus directed toward plaintiffs by supervisors did not rise to level of adverse employment action, absent evidence of more tangible change in duties

or working conditions that constituted material employment disadvantage).

■ The fourth prima facie element requires that the plaintiff show a reasonable inference of discriminatory motive underlying the adverse action. A court is required to determine whether the evidence creates a reasonable inference that race was a determinative factor in the adverse employment decision. *Carter v. St. Louis,* 167 F.3d 398, 401 (8th Cir.1999).

Schwebach made racially derogatory remarks and gestures towards McGregory. The supervisor verbalized racial stereotypes regarding Indians. Elliott testified that Schwebach told her he had consulted a lawyer, who advised Schwebach to not say the word "monkey" around McGregory again, but to inflame McGregory, drive him to insubordination, and then terminate him. (Elliott Dep. at 65.) Elliott conducted two investigations into the complaints against McGregory because she became suspicious of their accuracy. Elliott discovered that three people whom she supervised were ordered by Myers and Schwebach to forego standard procedure and report McGregory's wrongdoings directly to them, rather than to Elliott. She also discovered that several of the allegations against McGregory were fabricated. Elliott felt that Schwebach and Myers created a racist climate and were out to get McGregory. This evidence is enough for a jury to make a reasonable inference that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory motive.

The Court holds that McGregory has established his prima facie case of discriminatory demotion.

### 2. Defendant's Legitimate Nondiscriminatory Reason

Following McGregory's establishment of a prima facie case, Defendants must offer a legitimate, nondiscriminatory reason for

their actions. *See McDonnell Douglas*, 411 U.S. at 802–04, 93 S.Ct. 1817. Defendants' burden is one of production, not persuasion; it involves no credibility assessment. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

■ Defendants offer evidence, including write-up documentation, indicating that McGregory engaged in various workplace infractions. Defendants claim that these write-ups were the basis for McGregory's demotion.

The Court finds that the Defendants have met their burden of offering a legitimate, nondiscriminatory reason for the demotion.

### 3. Pretext for Unlawful Discrimination

■ McGregory contends that Defendants' asserted nondiscriminatory reason is pretext for unlawful discrimination. McGregory claims that many of the complaints against him were fabricated, that Defendants solicited such complaints to provide a basis for their adverse employment action, and that Defendants' conduct was motivated by racial discrimination.

■ "It is not enough ... to disbelieve the employer; the fact finder must believe the plaintiff's explanation of intentional discrimination." *Hicks*, 509 U.S. at 519, 113 S.Ct. 2742. There must be sufficient evidence for a reasonable trier of fact to infer unlawful discrimination. *McCullough v. Real Foods, Inc.*, 140 F.3d 1123, 1128 (8th Cir.1998). Overall evidence of pretext may allow a reasonable fact-finder to infer that discriminatory animus motivated the employer's adverse employment decision. *Vaughn v. Roadway Express, Inc.*, 164 F.3d 1087, 1090 (8th Cir.1998); *see Hicks*, 509 U.S. at 510, 113 S.Ct. 2742 ("The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination"); *Rothmeier v. Investment Advisers, Inc.*, 85 F.3d 1328, 1336 (8th Cir.1996).

Here, there is sufficient evidence for a jury to find that Defendants' proffered reason for demoting McGregory is pretextual. Evidence exists from which a jury could reasonably infer that many write-ups were not legitimate. Elliott testified that her investigation revealed that complaints were fabricated. Several times, McGregory contested write-ups and succeeded in getting complaints removed from his file. When McGregory requested his file after he quit, he discovered at least two write-ups that he had not known existed.

The Court holds that McGregory's evidence of pretext and the evidence supporting his prima facie case are sufficient to permit a fact finder to reasonably infer intentional discrimination based on race.

## II. Retaliation Claims

■ Defendants assert that McGregory failed to present a prima facie case of retaliation. Title VII makes it unlawful for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e–3(a). To establish a prima facie case of retaliation under Title VII, a plaintiff must show: (1) he engaged in a statutorily protected activity; (2) an adverse employment action was taken against him; and (3) a causal connection between the two events. *LaCroix v. Sears, Roebuck, and Co.*, 240 F.3d 688, 691 (8th Cir.2001); *see Montandon v. Farmland Indus., Inc.*, 116 F.3d 355, 359 (8th Cir.1997). The same standards apply to ICRA retaliation claims. *See Falczynski*, 533 N.W.2d at 230 n. 2. Once a plaintiff has

made a prima facie showing, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *Cross v. Cleaver* , 142 F.3d 1059, 1071–72 (8th Cir.1998). If the employer meets its burden, the presumption of retaliation disappears. *Id.* at 1072. The employee must then present evidence capable of proving the employer's proffered reasons for termination were pretext for unlawful retaliation. *Id.*

■■■■ The first prong of the prima facie case requires the plaintiff to show that he engaged in protected activity. Title VII protects activities ranging from filing a complaint to expressing a belief that the employer has engaged in discriminatory practices. *Buettner v. Arch Coal Sales Co.*, 216 F.3d 707, 713 (8th Cir.2000), 42 U.S.C.A. § 2000e–3. Title VII does not, however, protect an employee's complaints about conduct that does not violate Title VII, including harassment that is not "so severe or pervasive as to alter the conditions of [the victim's] employment and create an abusive working employment." *Clark County School Dist. v. Breeden*, 532 U.S. 268, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (per curiam).

■■■■ Defendants assert that McGregory has not shown that conditions were severe or pervasive enough to create a hostile work environment, and the only evidence of race discrimination is a stray remark, the "monkey" statements. McGregory complained to management about more than Schwebach's "monkey" statements. McGregory also complained about numerous write-ups, some of which he believed were based on his race. Considering the facts in the light most favorable to McGregory, a reasonable inference

is that he complained about several acts of harassment and discipline based on his race. He tried to get a mediator, and he called the employee assistance program, before finally deciding to get a lawyer. McGregory has established the first element of his prima facie case.

The second element of a discriminatory retaliation prima facie case requires an adverse employment action. Defendants claim that McGregory's employment ended because he voluntarily quit, rather than because he was discharged. The Court agrees that McGregory quit from his employment. However, McGregory asserts that Defendants retaliated against him through a series of retaliatory acts.

■■■■ "A series of retaliatory conduct falling short of discharge or termination can, as a matter of law, constitute an adverse action." *Bassett v. City of Minneapolis*, 211 F.3d 1097, 1105 n. 16 (8th Cir.2000) (citing *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1060 (8th Cir.1997)). A series of retaliatory conduct constituting adverse employment action may include reduction of duties, disciplinary action, negative personnel reports, and "papering" a file to support the employer's ultimate recommendation of termination. *Id.* at 1105 n. 16, 1106. A job transfer to a new position lacking supervisory status, having fewer opportunities for salary increases, and offering little opportunity for advancement can also constitute an adverse action. *Davis*, 115 F.3d at 1369.

■■■■ Here, McGregory has provided evidence that Defendants subjected him to a series of retaliatory conduct including disciplinary action, negative personnel reports, "papering" his file, and race-based humiliating names in the presence of co-workers.[5] McGregory's January

---

**5.** Viewing the evidence in the light most favorable to McGregory, the Court holds that sufficient evidence exists for a jury to find that

some negative write-ups constituted part of the alleged discriminatory conduct about

1999 demotion to retrievals, even though not triggering a salary reduction, meant a substantial reduction in duties and lacked supervisory status. McGregory has established the second element of his prima facie case.

The third component of a prima facie case requires a causal link between the adverse action and the protected activity. Defendants claim that the five-and-a-half-month time period that elapsed following McGregory's January 29, 1999, EEOC filing and Goldin's July 8, 1999, separation letter does not create a causal link because the Eighth Circuit has held that a mere "coincidence of timing" does not raise an inference of causation. *See Scroggins v. University of Minnesota,* 221 F.3d 1042, 1045 (8th Cir.2000). However, a series of retaliatory conduct, not the July 8, 1999, separation, is the relevant adverse employment action at issue.

■ The evidence, taken in the light most favorable to McGregory, shows that Defendants "papered" McGregory's file with adverse write-ups, used those write-ups as the basis for probation and demotion decisions, and subjected McGregory to acts of racial bias. All this was occurring while McGregory was "getting the job done." Interspersed throughout the period of the retaliatory conduct, McGregory complained to managers about the "monkey" statements and write-ups he felt were racially motivated. McGregory has raised a genuine issue of material fact concerning the causal connection between the adverse action and his protected activity. The Court holds that McGregory has established a prima facie retaliation claim.

For the reasons discussed above in relation to the discrimination claim, the Court holds that McGregory has pointed to evidence sufficient to permit a fact finder to reasonably infer unlawful retaliation. Defendants' Motion for Summary Judgment on the retaliation claim is denied.

### III. Individual Liability for Schwebach and Myers

■ As Defendants correctly state, the Eighth Circuit has held that supervisors may not be held individually liable under Title VII. *See Spencer v. Ripley County State Bank,* 123 F.3d 690, 691–92 (8th Cir.1997), *Roark v. City of Hazen, Ark.,* 189 F.3d 758, 761 (8th Cir.1999). McGregory does not challenge this rule, but asserts correctly that Schwebach and Myers may be held individually liable under the ICRA. *See Vivian v. Madison,* 601 N.W.2d 872, 878 (Iowa 1999). Regarding McGregory's ICRA claims, for the reasons discussed above, Schwebach and Myers are entitled to summary judgment on the claim of discriminatory discharge, but not on the remaining claims. Schwebach and Myers are entitled to summary judgment on all claims of individual liability under Title VII.

### CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (Clerk's No. 17) is **granted** as to Plaintiff's claim of discriminatory discharge and as to all claims of individual liability under Title VII, but is **denied** as to Plaintiff's claims of discriminatory demotion and retaliation. The Court has not analyzed Plaintiff's hostile-work-environment claim, because Defendants do not challenge this claim in the present Motion.[6]

which McGregory complained, and that some write-ups constituted retaliation.

6. Defendants do not appear to challenge the hostile-work-environment claims in Counts I and II. In arguing that McGregory cannot establish a constructive discharge claim,

however, Defendants assert that McGregory's evidence "falls far short of showing that any actions of Crest ... were 'severe or pervasive enough' to create a hostile work environment." (Mem. Auth. Support Defs.' Mot. Summ. J. at 8.) (Internal quotations omitted.) To the extent this argument might be con-

Due to conflicts on the undersigned's docket, the Final Pretrial Conference set for May 1, 2001, at 9:00 a.m., and the trial previously set for May 21, 2001, will be rescheduled. The Court will hold a Rule 16(b) conference on May 1, 2001, at 9:00 a.m., to reset the Final Pretrial Conference and trial. The Rule 16(b) conference will be held by telephone conference call placed by Plaintiff.

IT IS SO ORDERED.

strued as attacking McGregory's hostile-work-environment claims, the court finds the argument unpersuasive. Whether allegedly fabricated write-ups, Myers' and Schwebach's efforts to have McGregory's subordinates bypass Elliott in reporting McGregory's performance problems, and Schwebach's "monkey" statements, created an objectively hostile environment based on race discrimination is a question best left to the jury under the facts of this case. *See Phillips v. Taco Bell Corp.,* 156 F.3d 884, 888 (8th Cir.1998) (considering totality of circumstances); *see also Spriggs v. Diamond Auto Glass,* 242 F.3d 179, 185 (4th Cir.2001) (stating that in terms of odiousness, use of word "monkey" to describe African–Americans was similar to use of word "nigger," which "[f]ar more than a mere offensive utterance, . . . is pure anathema to African–Americans"; "[t]o suggest that a human being's physical appearance is essentially a caricature of a jungle beast goes far beyond the merely unflattering; it is degrading and humiliating in the extreme") (in-

ternal quotations omitted); *Delph v. Dr. Pepper Bottling Co. of Paragould, Inc.,* 130 F.3d 349, 356 (8th Cir.1997) (stating racial harassment was all the more egregious, when two supervisors were primarily responsible for creating and maintaining racially hostile atmosphere; "[r]acial harassment directed at an employee by a single supervisor can sufficiently poison the employee's working atmosphere") (citation omitted); *cf. Rodgers v. Western–Southern Life Ins. Co.,* 12 F.3d 668, 675 (7th Cir.1993) (holding supervisor's use of word "nigger" twice in plaintiff's presence contributed to hostile work environment); *Cherry v. Menard Inc.,* 101 F.Supp.2d 1160, 1181 (N.D.Iowa 2000) ("Perhaps no single act can more quickly 'alter' the conditions of employment and create an abusive working environment' than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates.") (quoting *Richardson v. New York State Dep't of Correctional Serv.,* 180 F.3d 426, 439 (2d Cir.1999)).